UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DANIEL RAY LOYD,

        Petitioner,

    v.

NEIL MCDOWELL, Warden,

        Respondent.

Case No. 18-cv-07228-HSG (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

## I.    INTRODUCTION

Petitioner Daniel Ray Loyd, a state prisoner currently incarcerated at Ironwood State Prison, brings this *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging the validity of a judgment obtained against him in state court which involved multiple offenses, including first-degree felony murder based on a finding that Petitioner killed a woman named Cindy Quiett during an attempted robbery.

Respondent has filed an answer to the petition. Dkt. Nos. 25, 25-1. Petitioner has filed a traverse. Dkt. No. 36. For the reasons set forth below, the petition is denied.

## II.    PROCEDURAL HISTORY

A Lake County jury found Petitioner guilty of first degree murder, assault with a firearm, possession of a firearm by a felon, and possession of ammunition by a felon. 5 Clerk's Transcript ("CT") 1540-1544. The jury also found true a special circumstance allegation that the murder was committed during an attempted robbery as well as multiple gun-use allegations. 5 CT at 1542. The Lake County Superior Court found true the prior conviction and prior prison term allegations, 7 CT 1885, and sentenced Petitioner to a term of life in prison without the possibility of parole plus an additional term of twenty-six years and four months, 7 CT 2814-2190.

On December 5, 2017, the California Court of Appeal affirmed the convictions and sentence. *People v. Loyd*, No. A149159, 2017 WL 6014413 (Cal. Ct. App. Dec. 5, 2017).

On January 12, 2018, Petitioner submitted a petition for review to the California Supreme Court. Dkt. No. 26-13; Resp't Ex. 10. On March 14, 2018, the California Supreme Court denied the petition for review. Dkt. No. 26-13 at 121; Resp't Ex. 11.

On May 4, 2018, Petitioner filed a habeas petition, Case No. A154216, in the California Court of Appeal, which was denied on May 16, 2018, without prejudice to the petition first being filed in the state superior court. Dkt. No. 26-13; Resp't Ex. 12.

On July 9, 2018, Petitioner filed another habeas petition, Case No. A154744, in the California Court of Appeal, which was denied on July 12, 2018. Dkt. No. 26-13; Resp't Ex. 13.

On September 24, 2018, Petitioner filed a petition for review with the California Supreme Court seeking review of the California Court of Appeal's July 12, 2018 denial of his state habeas petition. Dkt. No. 26-13; Resp't Ex. 14.

On September 26, 2018, the clerk of the California Supreme Court returned the petition for review to Petitioner unfiled with the following cover letter:

> We hereby return unfiled your petition for review, which we received on September 26, 2018. A check of the Court of Appeal docket shows that an order denying petition for writ of habeas corpus [was] filed on July 12, 2018. This court lost jurisdiction to act on any petition for review after August 13, 2018. (See Cal Rules of Court, rule 8.500(e).) Without this jurisdiction, this court is unable to consider your request for legal relief.

Dkt. No. 26-13 at 151; Resp't Ex. 15 (brackets added).

On November 8, 2018,[1] Petitioner filed the instant petition in the United States District Court for the Eastern District of California. Dkt. No. 1. On November 29, 2018, this case was transferred from the Eastern District to this District. Dkt. No. 3. The case was reassigned to the undersigned judge on December 21, 2018. Dkt. No. 9. On January 31, 2019, the Court found that

---

[1] According to the proof of service, Petitioner handed his letter to prison officials for mailing on November 8, 2018. Dkt. No. 1 at 12. Therefore, the Court considers the petition as deemed filed on that date. *See Saffold v. Newland*, 250 F.3d 1262, 1268 (9th Cir. 2001), *vacated and remanded on other grounds*, *Carey v. Saffold*, 536 U.S. 214 (2002) (holding that a federal or state habeas petition is deemed filed on the date the prisoner submits it to prison authorities for filing, rather than on the date it is received by the court).

the petition stated the following cognizable claims for federal habeas relief: (1) the trial court erred by failing to correctly instruct the jury on the causation required for felony murder and by failing to instruct the jury that if the felony-murder rule did not apply, the murder charge was governed by the provocative act murder rule; (2) the trial court erred by failing to instruct the jury on lesser included offenses; (3) the trial court erred in failing to reread defense counsel's closing argument regarding proximate cause as requested by the jury; (4) the trial court erred by admitting Petitioner's custodial statements made after he invoked his right to counsel; (5) ineffective assistance of counsel ("IAC") claims against trial counsel on multiple grounds; and (6) trial counsel's errors resulted in cumulative error. Dkt. No. 10.

On January 1, 2020, the Court granted Respondent's motion to dismiss based on Petitioner's failure to exhaust his state court remedies for his IAC and cumulative error claims. Dkt. No 18. Because the petition contained both exhausted and unexhausted claims and was therefore what is referred to as a "mixed" petition under *Rhines*,[2] the Court allowed Petitioner to elect how to proceed with his "mixed" petition. Dkt. No. 18 at 7-10. On January 28, 2020, Petitioner elected to proceed by filing a motion for stay of the proceedings while he exhausted his unexhausted claims in the California Supreme Court. Dkt. No. 19-20.

On March 6, 2020, the Court stayed the petition to allow Petitioner to exhaust his state court remedies. Dkt. No. 22.

On March 19, 2020 and April 2, 2020, Petitioner filed state habeas petitions in the California Supreme Court, in which he raised his IAC and cumulative error claims. Resp't Exs. 18 & 20. The state supreme court summarily denied the state habeas petition filed on March 19, 2020, and denied the state habeas petition filed on April 2, 2020, because it was repetitive. Resp't Exs. 19 & 21.

On May 23, 2020, Petitioner notified the courts that his claims had been exhausted. Dkt. No. 23. On July 6, 2020 the stay was lifted, the original petition remained the operative petition, and Petitioner's case was reopened. Dkt. No. 24.

---

[2] *Rhines v. Weber*, 544 U.S. 269, 277 (2005).

On October 5, 2020, Respondents filed an answer. Dkt. Nos. 25-1. On November 20, 2020, Petitioner filed a traverse. Dkt. No. 36.

On November 23, 2020, the Court denied Petitioner leave to file the petition originally filed in Case No. 20-cv-7659 HSG (PR)[3] and docketed in this action as Dkt. No. 33, which challenged the same conviction as in this action, but alleged a new claim for federal habeas relief: the denial of right to counsel (distinguished from Petitioner's IAC claims). Dkt. No. 35. The denial was without prejudice to Petitioner filing an amended petition that contained both the six claims already found cognizable and the claim of denial of counsel. *Id.* at 3. The Court advised Petitioner that the failure to file an amended petition would result in Dkt. No. 1 remaining the operative petition. *Id.*

On December 17, 2020, instead of filing an amended petition, Petitioner filed a motion seeking to withdraw the petition originally filed in C No. 20-cv-7659 HSG (PR), and to proceed on the original petition filed in this action. Dkt. No. 37. The Court denied this motion as moot, stating that pursuant to the Court's November 23, 2020 order (*see* Dkt. No. 35), the operative petition in this action remained Dkt. No. 1 (*see* Dkt. No. 39 at 1).

This matter is fully briefed and ripe for adjudication.

## III. STATEMENT OF FACTS

The state appellate court handled the direct appeal filed by Petitioner in an unpublished opinion and described the relevant facts as follows:[4]

---

[3] On October 2, 2020, Petitioner filed a separate *pro se* habeas petition. *Loyd v. McDowell*, C No. 20-cv-07695 HSG (PR) ("*Loyd II*"), Dkt. No. 1 (filed Oct. 2, 2020). Because this action was already pending, the Court administratively closed *Loyd II*, and construed the petition filed in *Loyd II* as a motion for leave to file an amended petition. *See Woods v. Carey*, 525 F.3d 886, 887–90 (9th Cir. 2008) (when *pro se* petitioner files new petition in the district court where an earlier-filed petition is still pending, district court must construe new petition as motion to amend the pending petition rather than as unauthorized second or successive petition).

[4] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on its independent review, the Court finds that it can reasonably conclude that the state appellate court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014), unless otherwise indicated in this order.

## A. The September 2011 Shooting of Cindy Quiett

In September 2011, Cindy Quiett and her boyfriend Joey Ryden were staying with friends at a home on Kensington Way in Lucerne, Lake County. On the morning of September 13, at around 3:30 a.m., the couple walked to a nearby intersection where Ryden had made arrangements via text messages to sell methamphetamine to his ex-girlfriend, Angel Spring. Ryden told Quiett to hide by a tree on the opposite side of the road, so she would be out of sight if police happened to appear during the drug deal. As Ryden approached the intersection, a van travelled across the road and stopped in front of him. At that point, Quiett was on the other side of the van, approximately 12 feet away.

Appellant, who Ryden recognized as Spring's new boyfriend, got out of the van and pointed a revolver in Ryden's face. With his finger on the cocked trigger, appellant said "Give me your shit, Joey. Give me your shit." The first time appellant issued his command, Ryden listened. The second time, Ryden tried to disarm appellant by knocking the gun away from his face. Appellant's arm moved toward the other side of the road, and then the gun went off. Ryden took off running. When he glanced back over his shoulder he saw the van backing down the street.

Then Ryden heard Quiett call his name, saw that "she was down," and ran back to her. He tried to pick her up, but when she kept collapsing he realized she had been shot in the stomach. Ryden ran to his friends' house to get help and then returned to Quiett's side to wait for medical personnel. Quiett went into cardiac arrest while she was in the ambulance. Doctors performed emergency surgery but were unable to save her life.

A forensic pathologist employed by the coroner division of the Lake County Sheriff's Office concluded that Quiett died from a single gunshot wound; the bullet entered her right lower chest, perforated her aorta, traveled through her abdomen and exited her lower left back. The entrance wound was 2.5 inches higher than the exit wound, which was an indication that she was either standing on a slope or leaning forward about 10 to 15 degrees when the bullet hit her body. The bullet that travelled through Quiett's body was never found.

## B. Appellant's Travel Companions

Two women were in the van when Quiett was shot, Angel Spring and Cynthia Downing. Just prior to the shooting, they spent several hours driving around with appellant while they were high on methamphetamine. Both women testified at appellant's 2015 trial.

Spring testified that when appellant drove to the intersection where he met Ryden, she knew appellant was going to buy meth, but she did not know that Ryden was the seller, and she did not know appellant had a gun until she saw him point it in Ryden's face. According to Spring, after appellant ordered Ryden to "[g]ive me your shit" the second time, Cindy Quiett "came out of nowhere and said something to [appellant], and [appellant] looked at her. And when he did, [Ryden] hit the gun to get it out of his face and it went off." Spring testified that when appellant got back in the van, he said the gun went off but nobody was shot. As appellant backed the van down the street, Spring saw Quiett on the ground. It was dark and Spring did not have her glasses on, but it appeared to her that Quiett was sitting upright. She asked appellant if Quiett was shot and he said no, but he may have run over her foot.

Downing testified that when appellant met Ryden on the morning of September 13, 2011, she was asleep in the van until a loud noise woke her. Then appellant got in the van and Downing noticed he had a gun. She was frightened and disorientated. But she later recalled that Spring was crying and asked appellant, "Did you shoot him?" Appellant responded, "No. I shot her." Downing also recalled that appellant said "Oh my God," and that it was an accident. As appellant backed down the street, Downing saw Quiett, who was her good friend, standing on the street clutching her purse. Quiett said "Oh my God," as she dropped to her knees. Downing was extremely upset and demanded to be let out of the van, so appellant dropped her off at her friend's house.

Spring testified that after they left Downing, she and appellant picked up their friend Micheal [*sic*] Santos and drove out to Reclamation Road. The van appellant had been driving belonged to another friend, Jody Young. Santos agreed to return Young's van and drive back in Spring's van. While they waited, Spring found a place to sleep near some blackberry bushes. Appellant was "freaking out" and held the gun while they waited. He woke Spring several times because he was so afraid. As it turned out, Santos never returned with Spring's van, but Downing called and told them that Quiett had died. After hearing that news, appellant and Spring made a plan to hide the gun in the blackberry bushes and turn themselves in, so Spring initiated contact with law enforcement.

## C. Appellant's Incriminating Statements

Detectives Drewrey and Herdt from the Lake County Sherriff's Department were dispatched to meet appellant and Spring near Reclamation Road. The detectives talked with Spring via cell phone to get directions, and created an audio recording of their interactions with the distraught couple.[FN 1] After the couple was placed in handcuffs and advised of their *Miranda* rights,[FN 2] they talked with the detectives about whether it would help their situation to turn in the gun and the public safety concerns associated with failing to do that. Then appellant and Spring led the detectives to the area where appellant tossed the gun into a blackberry bush, but they were not able to find it. The detectives thanked them for narrowing the search area, and made arrangements for other officers to continue the search.

[FN 1:] The audio recordings were admitted into evidence at trial.

[FN 2:] See *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

While the group walked back to the road, appellant asked Herdt for "a little input" about his "situation." Herdt responded that he did not know "the whole situation." Appellant and Spring both urged Herdt to tell them what he knew about what was going on. Herdt responded "You would have to tell me what happened, man." Drewrey added "You're the one that knows what's up, Dan." To that, appellant responded: "Joey . . . fucking had a gun in his face and he fucking hit the gun—and the fucking gun went that way and went off, dude. Exactly what the fuck happened." Drewrey said "All right," and appellant continued "Okay? That's exactly what the fuck happened. Stupid ass mother fucker. Oh my God. (INAUDIBLE). Fucking ruined a life for what? For what?" Spring urged appellant to calm down, but he continued: "Fucking human life for what. Three human lives . . . and maybe even more. What the fuck."

Drewrey told the couple they could ride to the sheriff's office together, where he would

talk with them about what had happened. Spring said that it was "really an accident" and that she could not believe that Ryden had reached out for the gun. Appellant said the whole situation was just too much for him to handle and said "I've killed an innocent lady over—oh my God." Spring repeated that it was an accident and that appellant needed to calm down. Appellant repeatedly apologized to both Spring and the detectives for what he had done. When Spring asked if she was going to be arrested, appellant told the detectives that she was not responsible. Appellant said that Spring knew he had the pistol with him that night, but "I just fucking called him up, decided to rob him. She didn't know nothing until I stopped the fucking thing, put it in park, and jumped out. She didn't know shit, okay. From there, that's it, bro. She didn't know." Appellant continued to talk to the detectives as they arranged for an officer to drive the couple back to town.

Officers continued their search of the area around Reclamation Road, and eventually found a gun in a blackberry bush. The revolver was loaded with four live rounds, one spent round with an empty casing in the cylinder, and one empty chamber. The gun was traced to Jody Young, the same man who had let appellant borrow his van. Young reported that he had purchased the gun from an acquaintance, but when appellant saw it, he said he recognized it and that it had been stolen from their mutual acquaintance. Young let appellant return the gun to its owner, but he had a bad feeling about the matter, so he took one of the bullets from the chamber before he gave it to appellant. Young gave that unused bullet to the detectives. The spent bullet from the gun was never found.

After the gun was recovered, Detective Drewrey interviewed appellant at the sheriff's office. Drewrey said that he understood there had been some sort of accident and asked appellant to tell him what happened. Appellant began to cry, explaining that he knew Quiett. Appellant made several incoherent remarks, and then said he did not want to hurt anybody, but just went there "to put him in check about something." Drewrey asked if Ryden was "messing with" Spring. Appellant said "No, he's disrespecting her."

Then appellant said he had called Ryden and arranged to buy $40 worth of dope and that it was "a spur of the moment thing" to "go fuckin take his shit." Drewrey asked how Ryden had disrespected Spring. Appellant said that it was "just the way" Ryden talked to her, trying to be friends or not enemies. Appellant added that he had a lot of other things going on in his life at the time.

After discussing other issues, Drewrey returned to the events of the previous night, asking if appellant had contacted Ryden "to get a forty sack." Appellant said he had, and then described what he did before he met Ryden: He borrowed Young's van, spent some time "hanging out at a friend's house," and then went to "go, go rob a couple people in Clearlake," but one guy was not home and he could not find the other person. Appellant said that Spring "didn't know that," but then immediately said "[w]e had no secrets." Drewrey asked whether appellant or Spring had called Ryden. Appellant said that he called Ryden, tried to get a "gram," but Ryden agreed to supply a "forty sack," so he, Spring and another woman went to meet him on Sixth Street.

Appellant told Drewrey that when he arrived at the meeting place, Ryden and Quiett were walking down the hill on Sixth. Appellant pulled the van over at the corner. He grabbed the pistol and jumped out of the van as Ryden approached the driver's side door, and told Ryden " 'Give me all your shit, give me the money and just pour the dope on the fuckin

street.' " Ryden responded, "What the fuck are you doing Danny?" Appellant stated that he was right in Ryden's face with the gun pointed at him, and he expected Ryden would try to run and he would hit him with the pistol. Ryden made a move as if he was going to run, but then stopped, changed his mind and hit the gun, the gun went off, and Quiett, who was off to the side, said "I'm shot dude, I'm shot."

Appellant admitted to Drewrey that he had the gun in Ryden's face with his finger on the trigger, but said he did not mean to shoot Quiett, explaining "He's fuckin, he hit me, my arm went like that. I'm like totally not expecting none of this shit. I just fuckin put a pistol in his fuckin face . . . I'm not expecting none of this. I'm not even." Appellant described the incident several times without changing the material details: he knew the gun was loaded; he pointed it at Ryden and told him to give appellant the money and dump his dope out; Ryden started to run but changed his mind; Ryden hit appellant and the gun went off.

Appellant assured Drewrey that he did not mean to shoot Quiett, and said that he did not understand how the bullet hit her when she was on the other side of the van. Appellant recalled that when he pointed the gun at Ryden, he heard Quiett say something like "What are you doing Danny? Fuck dude." Drewrey asked if the idea was to "rob" Ryden, to which appellant responded "Yeah . . . . I didn't go there to shoot him. I might of hit him with it . . . ."

Near the end of the interview, Drewrey asked appellant to explain how Ryden had disrespected him. Appellant responded, "Oh he just would." Drewrey asked again if appellant had a problem with the way Ryden treated Quiett, but appellant responded that was "not the issue at all."

**D. Appellant's Trial Testimony**
At his 2015 jury trial, appellant testified that many statements he made during his September 2011 interview with Detective Drewrey were false. According to appellant's trial testimony, Spring made arrangements to buy drugs from Ryden and appellant decided to go along with her because Ryden owed him money. Appellant testified that several days before the shooting, he had "fronted" Ryden an ounce of meth with the agreement that Ryden would pay him $1,200 in a week. However, Ryden did not pay and then did not respond to appellant's calls and text messages.[FN 3] When appellant put the gun in Ryden's face on September 13, 2011, he did not think Ryden had the money, but he did want "to get [his] dope back."

[FN 3:] Ryden testified on rebuttal that appellant never "fronted" him an ounce of methamphetamine, and that he did not owe appellant any money prior to the shooting of Cindy Quiett.

Appellant testified that he never demanded or intended that Ryden turn over his money. Rather, when he told Ryden to "[g]ive me your shit," he was only telling him to turn over the methamphetamine. Appellant explained that the reason he lied during the September 2011 interview was to hide the fact that he was a drug supplier; he did not want the detective to know that he had gone to get his "dope back" from Ryden because Ryden had failed to pay him for it.

At trial, appellant admitted that he told Drewrey that he had robbed some other people before he confronted Ryden, but explained that he had not robbed those people either. They owed him money because he had fronted drugs to them, and he was simply going around collecting debts. Appellant testified that he also lied when he told Drewrey that Ryden disrespected Spring, explaining to the jury that he "was just making stuff up to—to basically put all the blame on myself and not let them know that on top of everything else, I was also dealing drugs."

Under cross-examination, appellant admitted that the reason he borrowed Young's van was because he "[was] going to be driving around engaged in criminal behavior." However, appellant explained that when he told Drewrey that he used the van to "rob people," that was just a "figure of speech." He was simply referring to a "part of the dope game" in which "you get dope fronted to you, you don't pay, people come take your money—come take their dope back." Appellant also testified that the reason he used the revolver was to make his "presence known" so that he could recover things that he believed were rightfully his.

The prosecutor asked appellant about a letter he wrote to his friend Phyllis Newton approximately a month before trial. In the letter, appellant asked Newton to contact Spring, Young, and "everyone," and explain the felony-murder rule to them. He also asked Newton to make sure Spring understood that if she showed up to testify at trial, he would be sentenced to life in prison. The prosecutor asked appellant if he wrote the letter to discourage witnesses from testifying at trial. Appellant acknowledged that he was hoping that "[i]f they understood the felony[-]murder rule, they wouldn't show up."

### E. Appellant's Defense to the Murder Charge

Several issues on appeal pertain to procedural rulings regarding appellant's defense that he was not guilty of felony murder because he did not cause Quiett's death. As background, we briefly summarize the pertinent proceedings here.

### *1. Closing Arguments Regarding Felony-Murder*

The prosecutor acknowledged there was evidence that Quiett's death was an accident and that appellant did not intend to kill Quiett or anyone else. However, he argued these circumstances were irrelevant under California law because appellant killed Quiett while committing an attempted robbery of Ryden, which made him guilty of first degree murder under the felony-murder rule. In describing the requirements for applying the felony-murder rule, the prosecutor stated that he had to prove that appellant committed or attempted to commit robbery, that he intended to commit robbery, and that he caused the death of another person during that attempt. The prosecutor explained that there could be more than one cause of death, described the "substantial factor" test, and then presented an evidence-based argument that appellant's conduct caused Quiett's death under that test.

Defense counsel conceded during his closing argument that appellant was guilty of multiple offenses, but argued he was not guilty of murder. Under the defense theory, the prosecutor failed to carry his burden of proving the causation element of murder. Defense counsel urged the jury to focus on the legal definition of causation, which provides that "an act causes death if the death is the direct, natural, and probable consequence of the act." He argued that appellant's altercation with Ryden was not a legal cause of Quiett's death

9

because it was not something a reasonable person would know was likely to happen if nothing unusual intervened. By way of comparison, defense counsel suggested that Ryden's death would have been a direct, natural and probable consequence of appellant's conduct, but Quiett's death was not: "Something could happen, the gun goes off, it hits Mr. Ryden, he dies, it would be a whole different story. But this is someone that's standing far off on the side that's not involved in the altercation. In this case, something unusual happened to cause [Quiett's] death. And that was Mr. Ryden knocking the gun away, the gun going off, and then it hitting [Quiett]."

Defense counsel concluded his summation by urging the jury to focus on jury instructions pertaining to the causation element of murder, putting aside any desire to punish appellant: "And, again, you're not going to like what [appellant] did. You're not going to be happy that a convicted felon is running around with a gun, high on meth, committing robberies. But you can't let that interfere with your job as a—and duties as jurors. If you look at the evidence and you look at the jury instructions, you're going to find that that causation element wasn't met. You may not like the result. You may not like the fact that you have to return a verdict of not guilty. But you have a duty to follow the law even if you disagree with it. [¶] And if you look at the evidence in this case, you apply it to the law, you look at those two instructions regarding causation . . . and murder . . . you're going to find that [appellant] is not guilty of murder."

### 2. Jury Instructions Regarding the Murder Charge

Following closing arguments, the jury was instructed. Using CALCRIM No. 240, the court gave the jury the following instruction regarding the legal definition of an act causing death: "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor that causes the death."

The jury was instructed regarding the elements of felony-murder with a version of CALCRIM No. 540A, which stated: "The defendant is charged in Count I with murder under a theory of felony murder. To prove that the defendant is guilty of first degree murder under this theory, the People must prove that, one, the defendant committed or attempted to commit a robbery; two, the defendant intended to commit robbery; and three, while committing or attempting to commit robbery, the defendant caused the death of another person. [¶] A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent. [¶] To decide whether the defendant committed or attempted to commit robbery, please refer to the separate instructions that I will give you on that crime. You must apply those instructions when you decide whether the People have proved first degree murder under a theory of felony murder. [¶] The defendant must have intended to commit the felony of robbery before or at the time that he cause the death. [¶] It is not required that the person die immediately as long as the act causing death occurred while the defendant was committing the felony. [¶] It is not required that the person killed be the intended victim of the felony."

10

Immediately following this felony-murder instruction, the jury received another causation instruction, a version of CALCRIM No. 640, which stated: "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death. The failure of Cindy Quiett or another person to use reasonable care may have contributed to the death. But if the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death even though Cindy Quiett or another person may [have] failed to use reasonable care. [¶] If you have a reasonable doubt whether the defendant's act caused the death, you must find him not guilty."

### 3. Jury Verdicts and Appellant's Sentence

After the instructions were delivered, the jury deliberated for approximately 90 minutes before requesting to adjourn for the day and submitting the following note to the court: "On reconvening at 9AM 3 jurors would like to hear the argument of defense counsel regarding the proximate cause jury instruction, if the judge approves."

The following morning, the jury continued deliberating while the court and counsel discussed the jury's note. Ultimately, the court decided to respond by rereading the causation jury instructions. The court advised trial counsel that if the jury was not satisfied with that response, it would consider other options including, for example, reopening the case and allowing both sides to give a short supplemental argument. After the court repeated the causation instructions, the jury continued deliberations and returned verdicts less than an hour later.

Appellant was found guilty of first degree murder (Pen. Code, § 187, subd. (a)[FN 4]); attempted robbery (§§ 211, 664); assault with a firearm (§ 245, subd. (a)(2)); possession of a firearm by a felon (§ 12021, subd. (a)(1)); and possession of ammunition by a felon (§§ 12316, subd. (b)(1)). The jury found true a special circumstance allegation that the murder was committed during an attempted robbery (§ 190.2, subd. (a)(17)), as well as multiple gun use allegations (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a), 12022.53, subd. (b)).

[FN 4:] Undesignated statutory references are to the Penal Code, unless otherwise stated.

Following a court trial, the trial court found that appellant had a prior conviction for a serious or violent felony (§§ 667, subds. (a)-(b), 1170.12, subds. (a)-(d)), and had served two prior prison terms for felony convictions (§ 667.5, subd. (b)). Appellant was sentenced to life in prison without the possibility of parole and an additional term of 26 years 4 months.

*Loyd*, 2017 WL 6014413, at *1-7 (brackets and footnotes in original).

11

## IV. DISCUSSION

### A. Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000). The first prong applies both to questions of law and to mixed questions of law and fact, *see id.* at 407-09, while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Additionally, habeas relief is warranted only if the constitutional error at issue " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

Section 2254(d)(1) restricts the source of clearly established Federal law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state

12

court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

Under the second prong, *see* 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; T*orres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000). Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, the Court reviews the last reasoned decision by the state court. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018); *Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th Cir.), *amended*, 733 F.3d 794 (9th Cir. 2013).

In its unpublished disposition issued on December 5, 2017, the state appellate court addressed the merits of Petitioner's Claims 1 to 4.[5] *See Loyd*, 2017 WL 6014413, at *1-20. Therefore, the last reasoned decision as to these claims is the California Court of Appeal's

---

[5] Petitioner raised an IAC claim on appeal, but it was limited to a contention that his "attorney failed to defend the murder charge by arguing that a second shooter fired the bullet that killed Cindy Quiett." *See Loyd*, 2017 WL 6014413, at *17. He did not include this IAC claim, or any IAC claim, in his petition for review. *See* Dkt. No. 26-13; Resp't Ex. 10.

unpublished disposition. *See Wilson*, 138 S. Ct. at 1192; *Canedy*, 706 F.3d at 1156.

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011). Here, Petitioner presented his IAC claims (Claim 5) and his cumulative error claim (Claim 6) in his state habeas petition (Resp't Ex. 18), which the state supreme court summarily denied (Resp't Ex. 20). As such, these claims may be reviewed independently by this Court to determine whether that decision was an objectively unreasonable application of clearly established federal law. *Plascencia v. Alameida*, 467 F.3d 1190, 1197-98 (9th Cir. 2006) ("Because there is no reasoned state court decision denying this claim, we 'perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable.'") (citation omitted); *see Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003) ("Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."). "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. *See Hardy v. Cross*, 565 U.S. 65, 66 (2011) (per curiam); *Richter*, 562 U.S. at 97-100; *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam). As the Court explained, "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Felkner*, 562 U.S. at 598 (citation omitted). With these principles in mind, the Court addresses Petitioner's claims.

**B.    Petitioner's Claims**

**1.    Claim 1: Erroneous Felony Murder Instruction Regarding Causation**

Petitioner claims that the trial court erred by failing to correctly instruct the jury on the causation required for felony murder and by failing to instruct the jury that if the felony-murder

14

rule did not apply, the murder charge was governed by the provocative act murder rule.  Dkt. No.

1 at 4.

### a.    State Court Opinion

The state appellate court based its denial of Claim 1 on the following analysis:

### *1. Issues On Appeal*

Appellant contends he was denied his constitutional right to a fair trial because the trial court "erroneously removed" the causation element of murder from the jury's consideration.  Appellant does not argue, however, that the causation jury instructions quoted above were incorrect or otherwise improper.  Instead, he claims these instructions were incomplete because the jury was not told that (1) they could not convict appellant of felony murder if "Ryden's conduct" caused Quiett's death; and (2) if the felony-murder rule did not apply, the murder charge was governed by the provocative act murder rule.

" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Hudson* (2006) 38 Cal. 4th 1002, 1011-1012.)  In this case, the defense did not request that the trial court give any additional instruction regarding the causation element of murder.  Therefore, appellant must demonstrate that the court had a sua sponte duty to give one or both of the causation instructions he advocates for on appeal.

" 'It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.]  The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. [Citations.]' [Citation.]" (*People v. Smith* (2013) 57 Cal. 4th 232, 239.)  The court's sua sponte duty extends to defenses "when ' "it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' [Citation.]  Yet this duty is limited: 'the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly. [Citation.]  Thus, the court is required to instruct sua sponte only on general principles which are necessary for the jury's understanding of the case.[']  " (*People v. Garvin* (2003) 110 Cal. App. 4th 484, 488-489.)

### *2. Ryden's Conduct*

As noted, appellant contends the jury should have been instructed that if it found that "Ryden's conduct" caused Quiett's death, appellant could not be convicted of felony-murder.  This proposed instruction is a pinpoint instruction; it specifically addresses alleged evidence that Ryden caused Quiett's death and purports to identify a legal principle relevant to that specific evidence.  The trial court " 'need not instruct on specific points or special theories which might be applicable to a particular case, absent a request for such an instruction.' [Citations.]  Alternatively expressed, '[i]f an instruction relates "particular facts to the elements of the offense charged," it is a pinpoint instruction and the court does not have a sua sponte duty to instruct.' [Citation.]" (*People v. Garvin, supra*, 110 Cal. App. 4th at p. 489.)  Thus, appellant's failure to request his pinpoint causation instruction during the trial court proceedings is reason alone for rejecting this claim of error.

Furthermore, appellant was not entitled to this pinpoint instruction even upon request

because it mischaracterizes the legal significance of evidence that a third party played a causal role in Quiett's death. "Facts attacking legal causation are only relevant if the defendant's act was not a substantial factor in producing the harm or injurious situation. [Citation.] The defendant is liable for a crime irrespective of other concurrent causes contributing to the harm [citation] . . . ." (*People v. Wattier* (1996) 51 Cal. App. 4th 948, 953, italics omitted.) Thus, contrary to the directive in appellant's pinpoint instruction, the jury was not precluded from finding appellant guilty of murder if it believed that Ryden's conduct was a contributing cause of harm. Rather, in order to convict appellant of Quiett's murder, the jury had to find that appellant's conduct was a substantial factor causing her death.

Appellant argues that evidence Ryden "caus[ed] appellant's firearm to point at [Quiett] and discharge without appellant relinquishing contact with it" raised a "jury question as to whether appellant or Ryden caused the fatal shot." (Fn. omitted.) This argument conflates two distinct issues: the commission of the fatal act and the legal cause of Quiett's death. Only one person committed the fatal act of pulling the trigger and shooting the gun—that person was appellant. Nevertheless, there could have been more than one legal cause of death. Thus, the question for this jury was whether appellant's act of shooting the gun constituted a legal cause of Quiett's death under the somewhat unique facts presented by the evidence. The two CALCRIM causation instructions the trial court gave addressed that issue. By contrast, appellant's pinpoint instruction is based on his false premise that he was entitled to an acquittal of the murder charge if Ryden's act was also a substantial factor causing death.

Appellant mistakenly relies on a Bench Note accompanying CALCRIM No. 540A, which states: "If the evidence indicates that someone other than the defendant or coparticipant committed the fatal act, then the crime is not felony murder." This principle does not apply here because there is no evidence that Ryden committed the fatal act of shooting Quiett. In each case cited in the Bench Note accompanying CALCRIM No. 540A, a third party shot and killed someone during the course of a felony committed by the defendant. (*People v. Washington* (1965) 62 Cal. 2d 777, 782-783 [robbery victim used his own gun to kill defendant's accomplice]; *People v. Caldwell* (1984) 36 Cal. 3d 210, 216 [police killed co-felon who was attempting to flee scene of the robbery]; see also *People v. Gardner* (1995) 37 Cal. App. 4th 473, 475, 477 [victim of shootout could have died as a result of bullet fired by defendant's adversary].) In the present case, by contrast, Ryden did not shoot anybody or even have a gun.

Appellant insists that this case is "a variation of the factual scenario" in which a third party "fired the fatal shot from the third party's own firearm" because, although appellant was holding the gun, his discharge of the weapon was not intentional or volitional. Appellant does not explain his distinction between intentional and volitional. We note for the record that the evidence is undisputed that appellant put his own finger on the trigger of a loaded revolver and pointed it in Ryden's face. In any event, appellant's intent is not relevant to the causation element of murder. Appellant's characterization of this case as a variant of the third-party shooter scenario is simply not plausible in light of the fact that appellant was the only shooter here.

We accept for purposes of argument appellant's premise that the jury could reasonably have found that Ryden's act of hitting appellant's arm was a legal cause of Quiett's death. But that finding would not exonerate appellant. Rather, as the jury was properly instructed, the causation issue was whether appellant's conduct was a substantial factor in causing Quiett's death.

### 3. Provocative Act Murder

Appellant makes the separate but related claim that "the trial court was obligated to instruct

on provocative conduct murder as an alternative to felony murder under the evidence presented." This argument is based on a fundamental misconception of these two murder doctrines.

"Under the felony-murder doctrine, when the defendant or an accomplice kills someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant is liable for either first or second degree murder, depending on the felony committed. If the felony is listed in section 189, the murder is of the first degree; if not, the murder is of the second degree. [Citations.] Felony-murder liability does not require an intent to kill, or even implied malice, but merely an intent to commit the underlying felony. [Citation.]" (*People v. Gonzalez* (2012) 54 Cal. 4th 643, 654, italics omitted (*Gonzalez*).)

"When someone other than the defendant or an accomplice kills during the commission or attempted commission of a crime, the defendant is not liable under felony murder principles but may nevertheless be prosecuted for murder under the provocative act doctrine." (*Gonzalez*, *supra*, 54 Cal. 4th at p. 654, italics omitted.) The provocative act doctrine is a "variation on the law of transferred intent," which holds the defendant vicariously liable for a killing by a third party, often a police officer of a victim. (*Ibid.*) The provocative act doctrine applies when the third party killing is a reasonable response to a malicious act committed by the defendant or his accomplice during the course of a violent felony. (*Ibid.*) " 'In such a case, the killing is attributable, not merely to the commission of a felony, but to the intentional act of the defendant or his accomplice committed with conscious disregard for life.' [Citation.]" (*Id.* at p. 655.) In contrast to the felony-murder rule, malice is an element of provocative act murder. "When the defendant acts with express malice alone or with implied malice, provocative act murder is of the second degree. When the defendant acts with express malice and is also willful, deliberate, and premeditated, it is murder of the first degree. [Citations.]" (*People v. Mejia* (2012) 211 Cal. App. 4th 586, 604.)

Here, appellant argues that the trial court had a sua sponte duty to instruct the jury regarding both of these doctrines because "[w]ithout the provocative conduct instruction, the jury was forced into an all or nothing choice between first degree murder or acquittal, and was erroneously deprived of a second degree murder alternative via the provocative conduct route."

Appellant cites no authority for his novel claim. Conceivably, there may be a scenario in which a defendant is entitled to have the jury instructed regarding both felony-murder and provocative act murder, for example, if there is conflicting evidence regarding the identity of the shooter. However, the provocative act doctrine does not apply in the case at bar because appellant himself committed the fatal act—regardless whether Ryden's defensive act of pushing appellant's arm away was a contributing cause of death. Thus, this case falls within the rubric of the felony-murder doctrine. During the commission of an attempted armed robbery of Ryden, appellant shot and killed Quiett, a third party bystander.

Appellant argues that the absence of evidence that he intentionally or volitionally discharged the firearm that killed Quiett makes this case a mere "variant" of provocative act murder cases in which the victim was killed by a third party. This is the same argument appellant advances in support of his pinpoint instruction, and it fares no better in this context. Under the felony-murder doctrine, "inadvertent or accidental killings are first degree murders when committed by felons in the perpetration of [a] robbery. [Citations.]" (*People v. Washington*, *supra*, 62 Cal. 2d at p. 781.) Appellant cannot circumvent this law by mischaracterizing Quiett's death as a provocative act murder.

In his reply brief, appellant insists that the provocative act doctrine should apply to these

facts, arguing: "Obviously, if Ryden had wrested the gun from appellant's possession, attempted to shoot appellant, and fatally struck Quiett instead, the provocative act instruction would be required. The instant facts merely provide a variation on that aspect of the provocative act murder theory." As appellant implicitly concedes, Ryden did not wrest the gun from appellant or attempt to shoot anyone. Appellant shot the gun that fatally struck Quiett. Therefore, the provocative act murder doctrine does not apply as a matter of law.

*Loyd*, 2017 WL 6014413, at *7-10.

### b. Applicable Federal Law

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). To obtain federal habeas relief for error in the jury charge, the petitioner must show actual prejudice from the error, i.e., that the error had a substantial and injurious effect or influence in determining the jury's verdict. *See Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam) (citing *Brecht*, 507 U.S. at 637). The error may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *See Estelle*, 502 U.S. at 72.

On federal habeas review, the district court must defer to a state court's reasonable application of these principles. *Smith v. Spisak*, 558 U.S. 139 (2010); *Waddington v. Sarausad*, 555 U.S. 179, 191 (2009). Where a state court expressly held that a jury instruction correctly set forth state law, it is not the province of a federal habeas court to reexamine the state-court determination that rests on state-law grounds. *Waddington*, 555 U.S. at 192 n.5 (once federal habeas court concludes that state court reasonably found an instruction was unambiguous, federal habeas court should end its inquiry). A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) (citing *Estelle*, 502 U.S. at 67-68).

### c. Analysis

In Claim 1, Petitioner asserts that he was:

deprived of due process, a fair trial, and a jury verdict under the Sixth and Fourteenth Amendments by the trial court's erroneous instructions on felony murder causation and by the court's failure to instruct on provoca[tive] [act] murder, the failure to instruct that felony murder does not apply if the evidence supports an inference is [sic] prejudice and

18

deprived Petitioner of a fair trial.

Dkt. No. 1 at 4 (brackets added). Petitioner's contention appears not to be that the jury received incorrect instructions, but rather that two instructions were missing: (i) a pinpoint instruction relating to felony murder causation and (ii) a general instruction on the provocative act doctrine. *Id.*

### i. Felony Murder Causation Pinpoint Instruction

The jury received instructions relating to felony murder which said in pertinent part:

> The defendant is charged in Count I with murder under a theory of felony murder. To prove that the defendant is guilty of first degree murder under this theory, the People must prove that, one, the defendant committed or attempted to commit a robbery; two, the defendant intended to commit robbery; and three, while committing or attempting to commit robbery, the defendant caused the death of another person.

> A person may be guilty of felony murder even if the killing was unintentional, accidental, or negligent.

7 Reporter's Transcript ("RT") 1751.

As noted by the state appellate court, Petitioner does not appear to argue "that the causation jury instructions . . . were incorrect or otherwise improper." *Loyd*, 2017 WL 6014413, at *7. Rather, he argues that the jury should have received a pinpoint instruction relating to felony murder causation. On federal habeas review, this Court applies a high level of deference when evaluating state-court rulings, giving those decisions the benefit of the doubt. *See Renico*, 559 U.S. at 773. A state court's determination that the instructions are correct as a matter of state law is binding on this Court. *Waddington*, 555 U.S. at 192 n.5; *Bradshaw*, 546 U.S. at 76. Here, the state appellate court found that Petitioner "was not entitled to this pinpoint instruction even upon request because it mischaracterize[d] the legal significance of evidence that a third party played a causal role in Quiett's death." *Loyd*, 2017 WL 6014413, at *8. The state appellate court determined that in order to convict Petitioner of Quiett's murder under a theory of felony murder, the jury had only to find that Petitioner's conduct was a substantial factor in causing her death, regardless of whether Ryden's conduct was a contributing cause. *See id.* at *8. As the state appellate court found, even if it accepted Petitioner's premise that the jury reasonably could have found that Ryden's act of hitting Petitioner's arm was a legal cause of Quiett's death, such a

19

finding would not exonerate Petitioner.  *Id.*  The state appellate court added: "Rather, as the jury

was properly instructed, the causation issue was whether [Petitioner's] conduct was a substantial

factor in causing Quiett's death."  *Id.*  By ruling that the causation instructions were correct, the

state appellate court necessarily determined that they did not deprive Petitioner of a fair trial.  *See*

*Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim

without expressly addressing that claim, a federal habeas court must presume that the federal

claim was adjudicated on the merits," and thus the claim must be reviewed deferentially under 28

U.S.C. § 2254(d)).  Because the state appellate court determined that the instructions on felony

murder causation were correct under state law, federal habeas relief is unavailable.

### ii.  Provocative Act Doctrine Instruction

As the state appellate court noted, Petitioner's argument that the trial was unconstitutional

due to the trial court's failure to instruct on the provocative act doctrine as an alternative to felony

murder is "based on a fundamental misconception of these two murder doctrines."  *Loyd,* 2017

WL 6014413, at *9.  In accordance with state law, the state appellate court reasoned that while

instruction on both felony murder and the provocative act doctrine may be appropriate if there is

conflicting evidence about the identity of the shooter, those circumstances were not present in

Petitioner's case.  *Id.*  As the state appellate court explained, "[t]he provocati[ve] act doctrine is a

'variation on the law of transferred intent,' which holds the defendant vicariously liable for a

killing by a third party, often a police officer o[r] a victim."  *Id.* (quoting *People v. Gonzalez*, 54

Cal. 4th 643, 654 (2012) (brackets added)).  The state appellate court concluded that an instruction

on the provocative act doctrine was unwarranted because there was no factual dispute as to who

committed the fatal act.  *Loyd,* 2017 WL 6014413, at *10.  This Court is bound by the state

appellate court's interpretation of state law.  *See Bradshaw*, 546 U.S. at 74; *Hicks v. Feiock*, 485

U.S. 624, 629 (1988).  Moreover, the state appellate court's factual findings as to the nature of the

evidence are presumed correct, unless Petitioner rebuts them by clear and convincing evidence.

*See* 28 U.S.C. § 2254(e)(1).  In particular, the state appellate court's determination is entitled to a

presumption of correctness and "should be the final word on the subject."  *See Menendez v.*

*Terhune*, 422 F.3d 1012, 1029-30 (9th Cir. 2005).  Petitioner has made no showing to rebut that

presumption.

Accordingly, Petitioner is not entitled to habeas relief on Claim 1.

### 2. Claim 2: Failure to Instruct on Lesser Included Offense of Second Degree Murder

Petitioner claims that his constitutional rights were denied by the trial court's failure to instruct on the lesser included offense of second degree murder. Dkt. No. 1 at 4.

#### a. State Court Opinion

The state appellate court found as follows in rejecting Claim 2:

Appellant contends that even if the provocative conduct murder rule did not apply, the trial court erred by failing to instruct on second degree implied malice murder as a necessarily included offense of the first degree murder charge.[FN 5] In the trial court, defense counsel objected to giving a second degree murder instruction, arguing it was not supported by the evidence and also acknowledging a tactical objective of wanting to force the jury into an all or nothing decision with respect to the first degree murder charge. Appellant now contends that the trial court had a sua sponte duty to instruct on second degree implied malice murder notwithstanding his defense counsel's objection.

[FN 5:] Under the accusatory pleading test, second degree implied malice murder was a necessarily included offense of the first degree murder charge because the information alleged that appellant murdered Quiett "unlawfully, and with malice aforethought." (See *People v. Banks* (2014) 59 Cal. 4th 1113 (*Banks*), disapproved on another point in *People v. Scott* (2015) 61 Cal. 4th 363, 391, fn. 3.) This fact was not disputed in the trial court.

The trial court's sua sponte duty to instruct on general principles closely and openly connected to the case " 'extends to necessarily included offenses when the evidence raises a question as to whether all the elements of the charged offense are present. . . . [¶] Nevertheless, "the existence of 'any evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." [Citation.] Such instructions are required only where there is "substantial evidence" from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense.' [Citation.] 'Substantial evidence,' in this context, 'is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.]" (*People v. Williams* (2015) 61 Cal. 4th 1244, 1263.)

Appellant argues that the jury could have convicted him of second degree murder rather than first degree felony murder because attempted robbery was the only predicate felony supporting the first degree charge and the trial evidence did not foreclose a finding that he lacked the requisite intent to commit that predicate felony.

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Thus, "a felonious taking, that is, a taking done with the intent to steal

another's property, is a required element at the core of every robbery." (*People. v. Tufunga* (1999) 21 Cal. 4th 935, 948 (*Tufunga*).) However, contrary to appellant's claim here, we find no trial evidence that raised a question as to whether the intent element of robbery was established. Rather, the evidence of appellant's intent to steal property that was not his own was overwhelming. Every percipient witness including appellant confirmed that when appellant confronted Ryden with a loaded revolver, he said "[g]ive me *your* shit." (Italics added.) Furthermore, appellant confessed to the detectives who investigated this case that he intended to commit a robbery.

Appellant contends his trial testimony was substantial evidence that he lacked the intent to commit robbery. As our factual summary reflects, after appellant learned about the felony-murder rule, he testified at trial that his intent was not to steal from Ryden, but rather to collect money that was owed to him and to retrieve his own property, i.e., the drugs that he fronted to Ryden the previous week. Even if the jury was persuaded by this testimony, it was not substantial evidence that appellant lacked the intent to commit a robbery. A "claim-of-right defense can negate the *animus furandi* element of robbery where the defendant is seeking to regain specific property in which he in good faith believes he has a bona fide claim of ownership or title." (*Tufunga*, *supra*, 21 Cal. 4th at p. 950, original italics.) However, the claim of right defense to robbery "may not be raised when the defendant is attempting to collect on an unliquidated debt or damages claim. [Citations.]" (*Id.* at pp. 953-954, fn. 5, italics omitted.) Furthermore, the claim of right defense "is not available where the claim of right to the property is founded in a 'notoriously illegal' transaction. [Citations.]" (*Ibid.*)

Moreover, the relevant question is not whether the jury could have found that appellant lacked the intent to steal, but whether they could have found that he harbored some criminal intent, which would have made him guilty of a crime other than robbery. Appellant suggests the jury could have found that his only intent was to assault Ryden for disrespecting Spring. As our factual summary reflects, Detective Drewrey explored that issue with appellant during the September 2011 interview, but appellant disavowed any intent to punish Ryden for mistreating Spring. Furthermore, he did not change this part of his story when he testified at trial except to clarify that he made false statements during the 2011 interview because he did not want to get Spring in trouble. Thus the trial record does not contain substantial evidence that Ryden's relationship with Spring had any bearing on appellant's decision to brandish a loaded revolver in Ryden's face.

Alternatively, appellant contends the jury could have found that he confronted Ryden in order to intimidate him and "make his presence known" to Ryden and other dealers to whom he supplied drugs, so that they would pay their debts to him. Appellant reasons that this "type of intimidation may support a charge of extortion, but "intent to extort is not cognizable under the Penal Code section 189 felonies."

Extortion is defined in relevant part as "the obtaining of property from another, with his [or her] consent, . . . induced by a wrongful use of force or fear . . . ." (§ 518.) "The statutory definitions of robbery and extortion are structurally similar. [Citation.] Both offenses have their roots in common law larceny and both share a common element—acquisition by means of force or fear. [Citation.]" (*People v. Kozlowski* (2002) 96 Cal. App. 4th 853, 866.) The key distinction between these two offenses is that "in an extortion, the property is taken with the victim's consent, while in a robbery, the property is taken against the

victim's will. [Citation.]" (*Ibid.*)

In this case, evidence that appellant intimidated Ryden is consistent with the force or fear element of both robbery and extortion. But the nature of that intimidation—brandishing a loaded gun in a victim's face and ordering that the victim turn over his "shit"—negates the intent element of extortion, which requires an intent to take property *by consent*. Therefore, the record does not contain substantial evidence from which the jury could have found that appellant committed extortion rather than robbery.

Appellant mistakenly relies on *Banks, supra,* 59 Cal. 4th at page 1160. In that case, the defendant confronted a man named Foster at an ATM machine, shot him in the head and walked away. Witnesses testified that the defendant and Foster may have exchanged words, but nobody heard what was said, and there was no evidence that the defendant took any property from Foster before he fled the scene. The *Banks* trial court stated that what happened was "probably" a robbery, but there was evidence "that something else could have been going on," like a "verbal argument" of some sort. (*Id.* at p. 1158.) Nevertheless, the court did not give a second degree murder instruction because the defense objected to it. (*Ibid.*) The Supreme Court concluded this was error, finding that the trial court violated a sua sponte duty to instruct on second degree murder because "the evidence permitted the inference that defendant shot Foster with malice in the course of an argument or fight, not necessarily in the course of a robbery." (*Id.* at p. 1161.)

*Banks* is distinguishable on its facts because that defendant's altercation with his victim could have been unrelated to an attempted robbery. Here, by contrast, we know what appellant said to Ryden when he pointed a loaded gun in his face: "Give me your shit Joey." As discussed, this was not the only direct evidence of an intent to steal the property of another. Furthermore, as a matter of law, appellant's trial testimony that he only meant to collect a debt or recover his own illegal narcotics did not negate the evidence of his felonious intent to take property that was not his own. Thus, the trial court did not have a sua sponte duty to instruct on second degree implied malice murder because the evidence did not support it.

*Loyd*, 2017 WL 6014413, at *10-12 (emphasis in original).

### b. Applicable Law

The failure to instruct on a lesser-included offense in a capital case is constitutional error if there was evidence to support the instruction. *See Beck v. Alabama*, 447 U.S. 625, 638 (1980). But the failure of a state trial court to instruct on lesser-included offenses in a non-capital case does not present a federal constitutional claim. *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000). However, "the defendant's right to adequate jury instructions on his or her theory of the case might, in some cases, constitute an exception to the general rule." *Id.* (citing *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984)). *Solis* suggests that there must be substantial evidence to warrant the instruction on the lesser-included offense. *See* 219 F.3d at 929-30 (no

duty to instruct on voluntary manslaughter as lesser-included offense to murder because evidence presented at trial precluded a heat of passion or imperfect self-defense instruction; no duty to instruct on involuntary manslaughter because evidence presented at trial implied malice).

### c. Analysis

Petitioner asserts that he was deprived of a fair trial by the trial court's failure to instruct on lesser-included offenses, arguing: "Where there are conflicting inferences as to the existence of felonious intent to support a felony murder charge, the trial court is obligated to instruct on at least second-degree murder and perhaps manslaughter, depending on the facts of the case." Dkt. No. 1 at 4.

Federal habeas relief is unavailable on Claim 2 because the case at bar is not a capital case, and no Supreme Court case clearly establishes that the failure of a state trial court to instruct on lesser-included offenses in a noncapital case violates the Constitution. Accordingly, the state appellate court's rejection of Petitioner's claim was not "contrary to," or "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Petitioner is not entitled to the writ on Claim 2.[6]

### 3. Claim 3: Refusal to Reread Defense Proximate Cause Argument

Petitioner asserts that the trial court's refusal to have defense counsel's proximate cause argument reread at the jury's request resulted in the deprivation of his constitutional due process rights. Dkt. No. 1 at 5.

### a. State Court Opinion

The state appellate court summarized the circumstances of the jury's request in Claim 3 as follows:

After the instructions were delivered, the jury deliberated for approximately 90 minutes before requesting to adjourn for the day and submitting the following note to the court: "On reconvening at 9AM 3 jurors would like to hear the argument of defense counsel regarding the proximate cause jury instruction, if the judge approves.

The following morning, the jury continued deliberating while the court and counsel discussed the jury's note. Ultimately, the court decided to respond by rereading the

---

[6] In addition, to the extent the *Solis* standard is relevant, Petitioner has not made any persuasive showing that the facts here satisfy that exception.

causation jury instructions. The court advised trial counsel that if the jury was not satisfied with that response, it would consider other options including, for example, reopening the case and allowing both sides to give a short supplemental argument. After the court repeated the causation instructions, the jury continued deliberations and returned verdicts less than an hour later.

*Loyd*, 2017 WL 6014413, at *6. The state appellate court then rejected Claim 3 as follows:

As noted in our factual summary, three members of the jury submitted a request to "hear the argument of defense counsel regarding the proximate cause jury instruction, if the judge approves." The trial court responded to this request by reinstructing the jury regarding causation. Appellant contends he was entitled to a rereading of defense counsel's closing argument.

A deliberating jury has the statutory right to rehear evidence and instructions on request, but that right " 'does not extend to argument of counsel.' [Citation.]" (*People v. Gurule* (2002) 28 Cal. 4th 557, 649; see § 1138.[FN 6]) Instead, the "trial court's inherent authority regarding the performance of its functions includes the power to order argument by counsel to be reread to the jury or to be furnished to that body in written form. The exercise of such power must be entrusted to the court's sound discretion. As a result, review must be conducted under the deferential abuse-of-discretion standard." (*People v. Gordon* (1990) 50 Cal. 3d 1223, 1260, overruled on another point as stated in *People v. Tully* (2012) 54 Cal. 4th 952, 1031.)

[FN 6:] Section 1138 states: "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called."

Here, the trial court made a detailed record of its discretionary ruling. Preliminarily, the court recognized it had "inherent authority and discretion" to order that defense counsel's argument either be read back to the jury or provided to it in transcript form. Then, the court focused on crafting an answer that not only addressed the causation issue, but was fair to both sides. In considering options proposed by counsel, the court found that repeating the closing arguments in their entirety would be time consuming and counterproductive. On the other hand, it was not possible to parse the causation arguments because that element was intertwined with everything else. For example, the court pointed out, CALCRIM No. 240 states that all of the circumstances established by the evidence are relevant to the determination whether something is a natural and probable consequence of an act, and in this case, the jury would have to make credibility findings in order to discern the circumstances surrounding the shooting. The court also rejected the idea of simply denying the request because it would be inappropriate to throw up its hands and tell the jury they were on their own. Accordingly, as noted in our factual summary, it reread the jury instructions that addressed the causation element of the murder charge, with the caveat that if this response proved insufficient, it would revisit the issue.

Appellant argues the court erred by failing to reread the defense argument to the jury because causation was the most important issue to the defense and it was so complex that it was probably difficult for the jury to understand. The causation issue was not as complicated as appellant attempts to make it—the question presented to the jury was whether appellant's conduct was a substantial cause of Quiett's death. The court reminded the jury of the definition of substantial cause by reading the pertinent instructions. If the jury was confused about the evidence relevant to this determination, it had the right to

rehear that evidence, but it made no such request. Defense counsel's closing remarks were not evidence but argument, which raised a reasonable concern about repeating that specific argument without the context of the overall presentation by both counsel. The trial court resolved this concern without ignoring the jury's request by focusing on the pertinent legal principles. Appellant fails to identify any part of the trial court's ruling that could be characterized as an abuse of discretion.

Appellant mistakenly relies on *People v. Sims* (1993) 5 Cal. 4th 405, criticized on another ground in *People v. Storm* (2002) 28 Cal. 4th 1007, 1031-1032 (*Sims*). In that murder case, the trial court erred by finding that it lacked the "authority to order closing summations read back to the jury." (*Sims*, at p. 452.) However, the error was harmless because it was not reasonably probable that the jury would have reached a different verdict if the summation had been read back. (*Id.* at p. 453.) Appellant analogizes this case to *Sims*, arguing that the denial of the jury request in this case was prejudicial because his lack of causation defense was more complex than the defense in *Sims*. However, appellant cannot jump to a prejudice analysis without first proving error, which he has not done. In contrast to *Sims*, the trial court in this case was well aware of its authority to order the reading back of defense counsel's closing argument, but properly exercised its discretion by concluding that it would reinstruct the jury regarding the legal principles governing the causation element rather than attempt to parse the closing arguments addressing that issue.

Even if appellant could show that the trial court abused its discretion, the record does not show that the jury was confused about the causation element of murder, particularly after the court reread the instructions regarding the pertinent legal principles. Under these circumstances, it is not reasonably likely that the outcome of this case would have been more favorable to appellant if the trial court had repeated part of defense counsel's closing argument.

*Id.* at *12-13.

### b. Applicable Law

To obtain habeas relief following an allegedly erroneous response to a jury question, a petitioner must show: (1) constitutional error resulted; and (2) the error was not harmless. *Morris v. Woodford*, 273 F.3d 826, 833 (9th Cir. 2001). The test for "constitutional error" is set out in *Boyde v. California*, 494 U.S. 370, 380 (1990). To determine whether constitutional error occurred, the district court asks "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.* That inquiry also can be described as having two parts: (1) whether there is a reasonable likelihood that the jury understood an assertedly ambiguous instruction to mean what the defendant suggests it means; and (2) if so, "whether the instruction, so understood, was unconstitutional as applied to the defendant." *Morris*, 273 F.3d at 833 (quoting *Calderon*, 525 U.S. at 147).

"When a jury makes explicit its difficulties a trial judge should clear them away with

concrete accuracy." *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946). The trial judge has a duty to respond to the jury's request for clarification with sufficient specificity to eliminate the jury's confusion. *See Beardslee v. Woodford*, 358 F.3d 560, 574-75 (9th Cir. 2004) (due process violation occurred, but was harmless, when court, in responding to request for clarification, refused to give clarification and informed jury that no clarifying instructions would be given); *United States v. Frega*, 179 F.3d 793, 808-11 (9th Cir. 1999) (trial judge's confusing response to jury's questions raised possibility that verdict was based on conduct legally inadequate to support conviction). However, the trial judge has wide discretion in charging the jury, which carries over to the judge's response to a question from the jury. *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir. 2003) (finding trial court acted within its discretion by, in response to juror question, simply referring the jury to the instructions they had already been given); *Allen v. United States*, 186 F.2d 439, 444 (9th Cir. 1951) ("the giving of additional instructions has always been held to be within the discretion of the trial court").

The precise manner by which the court fulfills its obligation to address a jury question "is a matter committed to its discretion." *Johnson*, 351 F.3d at 994. For example, where the original instruction was correct and the judge directs the jury to a precise paragraph that answers the question clearly, this approach comports with due process. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Also, just as a jury is presumed to follow its instructions, it is presumed to understand a judge's answer to a question. *Id.* at 234. "To presume otherwise would require reversal every time a jury inquires about a matter of constitutional significance, regardless of the judge's answer." *Id.*

### c. Analysis

In Claim 3, Petitioner argues that:

> The trial court's refusal to permit the jury to have defense counsel's argument regarding proximate cause re-read after the jury instructions had been given deprived Petitioner of his due process, the jury had no foreknowledge of the principles of causation, that ruling was error because the causation issue was the most important defense issue.

Dkt. No. 1 at 5.

In determining whether or not to grant the jury's request and reread the defense closing, the

trial court considered *People v. Sims*, 5 Cal. 4th 405 (1993), noting that "[T]he Court should be looking to the theory argued by the defense. Was it of such complexity that its repetition was necessary in order for the defendant to receive the full benefit of the adversarial process?" 7 RT 1784. In assessing this question, the trial court said:

> When faced with questions from the jury, I can't just throw up my hands and tell the jury, "I cannot help." I've got to consider how we can best aid the jury in responding to them, responding in a way that's both legal and obviously fair to both sides.

*Id.* The trial court then heard arguments from both sides regarding whether or not to reread the defense closing argument, then found:

> The jury instruction for causation, CALCRIM [No.] 240, does say that in deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. While there were certain segments of arguments that dealt with causation, strictly dealt with causation, the arguments did deal with all the circumstances shown by the evidence. It would be very difficult for the court to start taking out just parts and not allow the full explication of the evidence because it's that evidence, you know, what happened, you know, credibility, what exactly happened, that has got to be considered by the jury. So you're not only talking about a discussion of the evidence that surrounds the act that causes death, but you're talking about credibility and what you believe about those circumstances. . . . ¶ This question came early on in the deliberations. When we read those jury instructions and portrayed them on the screen, it was like taking a sip of water out of a fire hose. And I think at this particular point, I would read to them 540A, then 240, then 620, and then the instruction that says if I repeat something, it doesn't mean it gets added emphasis because I know part of 620 repeats what is in 240. I think I would do that and say, you know, "In response to your question at this point, this is what I can do," and go ahead and do that. And then we'll just see how this proceeds. . . . So that's what I'm going to do. I'm going to have them come in here, and I'm going to say "At this point," and I'm going to use those exact words, "At this point in response to request No. 2, I am simply going to read back to you applicable instructions." . . . ¶ And by doing this, using my analogy, they're not going to be taking a sip of water out of a fire hose. They're going to be taking a sip of water out of a fountain. And then we'll see where they go. I'm not saying that I won't read everything back. But I'm not even going to address that with them. If they ask me that question, "Really, are you going to allow us to have that read back," I'll say "Hey this is my response at this point." I'm just going to leave it at that. . . . ¶ I just can't—I can't just restrict it to their rebuttal. And I don't know that I can just parse it out for the reasons I've said. And they're going to end up getting, again, using my analogy, a sip of water out of a fire hose because that argument's going to come in, and it's going to be talking about all sorts of stuff. Most of it is germane, but they're not going to—I just think it's better to read that law back to them at this point.

7 RT 1787-1790 (brackets added).

As the state appellate court noted, the trial court diligently considered the jury request before determining that the best course of action was to reread relevant jury instructions already given rather than reread defense counsel's argument. *Loyd*, 2017 WL 6014413, at *12-13; 7 RT 1781-1793. The original jury instructions, including the proximate cause jury instruction

28

(CALCRIM No. 240), are accurate statements of the law.  The trial court also appropriately read to the jury the elements of felony murder (CALCRIM No. 540A), as well as the special issues regarding causation (CALCRIM No. 620), then pointed the jury to the instruction clarifying that a repeated instruction does not get added emphasis (CALCRIM No. 200).  These instructions were also accurate and appropriate.  Following the submission of this question, the jury deliberated further and then returned verdicts less than an hour later.

Petitioner fails to show that the trial court's response to the jury question was unconstitutional.  *See Morris*, 273 F.3d at 833.  As an initial matter, the Court is bound by the state appellate court's determination that the trial court's response to the jury's question was adequate as a matter of state law.  *See Bradshaw*, 546 U.S. at 74 (federal court must accept state court's interpretation of state law); *Hicks*, 485 U.S. at 629 (same).  In addition, no constitutional error resulted because the jury was not reasonably likely to interpret the trial court's response in the manner that Petitioner claims when viewed in the context of the overall charge.  *See United States v. Harrison*, 34 F.3d 886, 889 (9th Cir. 1994) (explaining that a single jury instruction may not be judged in artificial isolation, but must be viewed in the context of the overall charge.).

Even if constitutional error had occurred, such error was  harmless because, as the state appellate court reasonably found, no favorable outcome would have resulted otherwise.  *See Morris*, 273 F.3d at 833.  The state appellate court reasonably concluded that the trial court properly acted within its discretion in responding to the jury question.  *Loyd*, 2017 WL 6014413, at *13.  The state appellate court further reasonably concluded that even if the trial court had abused its discretion, "the record does not show that the jury was confused about the causation element of murder, particularly after the court reread the instructions regarding the pertinent legal principles."  *Id.*  Finally, the state appellate court concluded that the record demonstrates that "it is not reasonably likely that the outcome of this case would have been more favorable to appellant if the trial court had repeated part of defense counsel's closing argument."  *Id.*

Accordingly, the state appellate court's denial of Claim 3 was not objectively unreasonable.  Therefore, Petitioner is not entitled to habeas relief for this claim relating to the trial court's allegedly inadequate response to a jury question.

#### 4.     Claim 4: Admission of Custodial Statements

Petitioner claims that his custodial statements to Detectives Drewrey and Herdt from the Lake County Sherriff's Department were improperly admitted despite his having invoked his right to counsel.  Dkt. No. 1 at 5.

#### a.  State Court Opinion

The state appellate court gave the following background and rejected this claim as follows:

> In a pretrial motion, the defense argued that when appellant was first advised of his *Miranda* rights on Reclamation Road, he invoked his right to counsel, but the detectives "ignored" his request for an attorney and continued to interrogate him.  As a remedy for the alleged *Miranda* violation, he sought to suppress all statements he made to law enforcement from that point forward.  Appellant now contends that the denial of his *Miranda* motion was reversible error.[FN 7]

> [FN 7:] In this court, appellant contends that the trial court erred by refusing to suppress evidence of the gun.  However, the record shows that the defense never requested suppression of the weapon itself.

> #### 1.  *Appellant's Recorded Statements*

> As noted in our factual summary, the meeting on Reclamation Road and Drewrey's subsequent interview of appellant were both recorded.  The trial court admitted the recordings into evidence at the *Miranda* hearing.  That evidence showed that when the detectives met appellant and Spring they searched the couple for weapons and handcuffed them.  Appellant was upset that he could not hold onto Spring, and Spring asked if handcuffs were necessary since they were trying to cooperate.  While the detectives gave an update to dispatch and requested a transport unit, appellant asked for a little more time and Spring said they wanted to go someplace where they could talk to the detectives about what had happened.  Spring, who recognized Detective Drewrey from a prior encounter, asked if she had to go to jail "too."  After Drewrey said they would both be taken to the jail later, appellant apologized to Spring and professed his love for her, and asked the detectives if they could go to the office before they were taken to jail.  The detective agreed to that request and then the following exchange occurred:

> "[DREWREY]: Just—I just want to ask this question real quick just so that nobody gets hurt.  Is that gun somewhere where somebody's going to find it and get hurt with it?

> [APPELLANT]: No.  (INAUDIBLE).  Oh, excuse me.

> [DREWERY]: No?  I want to make sure—

> [APPELLANT]: Dude, we'll get the gun.  We'll get the gun, okay.  Just let me fucking—

> [DREWERY]: Okay.

> [APPELLANT]: (INAUDIBLE).

> [DREWERY]: I just want to make sure nobody gets hurt with it.

> [APPELLANT]: Fuck, no.  Nobody's going to get hurt with it.

[DREWERY]: Okay. Well, if I had it, then nobody's going to get hurt with it, and that's important.

[APPELLANT]: I understand that. I understand that. I think—I think I need a little bit of time, please.

[DREWREY]: Okay. Yeah, no problem.

[APPELLANT]: I mean, just fucking give me a fucking couple hours, man, fucking whatever."

Then Spring asked whether it would be "helpful" for them to "cooperate and get it in." Appellant asked the detectives to tell him "straight up" if what he was doing "right now" was the right thing to do. Herdt responded that appellant knew as well as he did that "a judge will give you more mercy if you cooperate," but that "it all depends . . . ."

Drewrey said that he assumed the couple had heard their *Miranda* rights before. Appellant said yes and Spring became upset that she was being arrested. The detectives explained that she was in handcuffs but not under arrest "right now." Then Drewrey advised the couple of their *Miranda* rights. During the advisement, appellant made a few side remarks about his physical discomfort and wanting to stand next to Spring. When Drewrey finished, Herdt asked appellant whether he wanted his rights "re-explain[ed]," and appellant responded "No, I got them dude. I got them." Then the following exchange occurred:

"[HERDT]: Keeping those rights in mind, bud, we got to get that gun off the street, dude. We got to get it gone now.

"[APPELLANT]: Okay. Those rights in mind, don't you think I should talk to an attorney? I mean, just fucking can you call one so I can just ask him a question? Or what?

"[SPRING]: Danny, it's not going to make a difference.

"[APPELLANT]: I'm going to go by your—you're going to treat me right like you fucking, you know, give me your word that's fucking—

"[DREWREY]: Well, the—

"[APPELLANT]: To turn the gun in. I mean, you have a murder weapon, dude. I don't know.

"[SPRING]: Just wait, Danny. Just wait. Just wait.

"[APPELLANT]: I want to—it was—. . . Just wait.

"[DREWREY]: It being—it being a murder weapon—

"[APPELLANT]: It was an accident.

"[DREWREY]: —is not my concern.

"[APPELLANT]: It was an accident, Steve.

[DREWREY]: And it could be an accident.

[SPRING]: It was an accident.

31

[APPELLANT]: Oh my God."

The conversation continued in this vein, with appellant and Spring attempting to convince Drewrey that the shooting was an accident and Drewrey responding that there would be time to talk about that later, after the gun was off the street so that "little kids" would not be hurt by it. Appellant said that he understood that the detectives wanted the gun off the streets but asked how that situation was going to hurt him. Drewrey said that if somebody else was hurt by the gun, that would create more "issues." He said they would talk about everything that happened, but his immediate concern was to get the gun. Appellant asked Spring what he should do and she responded that she was confused and did not know. Then appellant said, "Come on. Let's go." Walking together, appellant and Spring then attempted to find their way back to the blackberry bush where appellant had tossed the gun.

As discussed in our factual summary, after the group stopped looking for the gun, appellant and Spring made incriminating statements in an effort to convince the detectives that the shooting was an accident. Later, when Drewrey interviewed appellant at the sheriff's office, he reminded appellant of his *Miranda* rights and appellant reiterated that he understood them. Then, appellant repeated the story he had told on Reclamation Road, sharing additional details about his attempted robbery of Ryden and his accidental shooting of Quiett.

### 2. Detective Herdt's Testimony

Detective Herdt was the only witness at the *Miranda* hearing.[FN 8 omitted] He testified that when he first made contact with appellant and Spring, his primary concern was officer safety because he knew they had a weapon. Furthermore, Herdt explained, after the couple was placed in handcuffs, he was still focused on securing the weapon. Herdt testified at length about public activities in that specific area, including jogging and blackberry picking, as well as gambling and recreation activities at venues nearby.

Herdt also recalled that while Drewrey was advising appellant of his *Miranda* rights, appellant interrupted him, so when the advisement was complete, Herdt asked if appellant needed to have any of his rights explained to him and appellant responded that he did not. Herdt testified that the transcript of their conversation does not reflect the fact that when they were discussing the need to get the gun off the street, appellant rambled on for some time while he was contemplating whether to talk to an attorney. Furthermore, Herdt stated that he and Drewrey did not do anything to encourage appellant to keep talking. Rather, it seemed to Herdt that appellant was thinking out loud, so he just let him continue to speak.

### 3. The Trial Court's Ruling

The defense argued that appellant's statement about wanting to ask a lawyer a question was an unequivocal request for an attorney and that every statement he made after that was inadmissible. The prosecutor responded, among other things, that under the totality of the circumstances a reasonable officer would not have concluded appellant was asking for a lawyer. Rather, appellant was thinking out loud, weighing his options, and trying to get advice from the officers about what he should do. The prosecutor also observed that the audio recording captured the "tenor of the defendant's voice," the "inflection in his voice as he's making these statements," and the appellant "think[ing] out loud and weigh[ing] his options in a manner so that we are able to know exactly what was going on in his head."

The trial court denied the *Miranda* motion during a break in the evidence phase of the trial. The court found, among other things, that appellant was properly advised of his *Miranda* rights; appellant understood his rights; and appellant voluntarily waived those rights.

Concluding that appellant did not invoke his right to counsel, the court reasoned that the two brief references to an attorney were ambiguous and equivocal. The court also found that appellant's primary objectives were to get things off his chest, to make it clear that the shooting was an accident, and to assure the detectives that Spring was not involved in his crime(s). Furthermore, appellant's "two references to counsel involve[d] [him] asking questions and weighing options out loud, but [he] never unequivocally stated that he wanted to speak to an attorney before any questioning and he never unequivocally stated that he wanted to have an attorney present during any questioning." Under these circumstances, the court concluded, "[a] reasonable officer under the circumstance would not conclude that the defendant was invoking his right to counsel."

### 4. Analysis

"The principles of law applicable to [a] defendant's *Miranda* claim are well established. Questioning remains an important part of any criminal investigation. Police officers may legitimately endeavor to secure a suspect's participation in the interrogation process so long as constitutional safeguards are honored. [Citation.] [¶] Once an in-custody suspect invokes his right to either silence or counsel, interrogation must cease. [Citation.] If the right to counsel is invoked, the suspect cannot be interrogated further, unless counsel is provided [citation] or the suspect reinitiates contact with the police. [Citations.]. Interrogation includes both express questioning and 'words or actions . . . the police should know are reasonably likely to elicit an incriminating response from the suspect.' [Citation.] [¶] After a suspect has invoked the right to counsel, police officers may nonetheless resume their interrogation if "the suspect '(a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.' " [Citations.] The waiver must be " 'knowing and intelligent . . . under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.' " [Citation.] The prosecution has the burden of proof on these points. [Citation.]

" ' "In reviewing constitutional claims of this nature, it is well established that we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained." [Citation.]' [Citation.]" (*People v. Enraca* (2012) 53 Cal. 4th 735, 752-753.)

Applying these principles here, we affirm the trial court's ruling that when appellant was advised of his *Miranda* rights on Reclamation Road, he did not invoke his right to counsel. Substantial evidence supports the factual components of the trial court's analysis, including that appellant consistently expressed a desire to communicate with the detectives in order to convince them that the shooting was an accident, and that appellant briefly contemplated asking for an attorney, but elected instead to engage the detectives in an ongoing dialogue about what had happened and what consequences he faced. Under these facts, a reasonable officer in the detectives' situation would not have concluded that appellant was invoking his right to counsel.

Appellant contends that his statements were "less than knowing and voluntary" because Detective Herdt exerted "pressure" on him by invoking public safety concerns. In its ruling, the trial court stated that the defense was not contending that "that the statements of the defendant were involuntary," and then went on to find that "the evidence in the Court's view does not support such a contention." We agree. The record shows that public safety was not a pretense but a legitimate concern.[FN 9] Furthermore, the detectives did not use that concern to coerce appellant to talk about the shooting incident. Rather, from the beginning, appellant was anxious to talk about what happened while the detectives were focused on the need to recover the gun.

[FN 9:] When Herdt and Drewrey first saw appellant and Spring, they were walking down a small dirt road toward an asphalt area near Reclamation Road. An elderly man was jogging within 200 feet of the couple. The meeting place was approximately a mile away from the Robinson Rancheria, a casino and entertainment venue that employed a large number of the 60,000 residents of Lake County. In close proximity to the casino, there was also a youth recreation center, a recycling center, a tribal office, and a residential community of about 20 homes. [¶] At or near the blackberry bushes where the gun was recovered, there was a piece of plywood that had been used as a makeshift sleeping area. As appellant and Spring led the detectives to this area, Herdt noticed that someone had essentially created a path in the tall weeds by trampling through them on their way to the blackberry bushes. Herdt testified that people often collected blackberries from the bushes.

Appellant intimates that when he asked "Those rights in mind, don't you think I should talk to an attorney," Detective Herdt had some obligation to say "yes." Characterizing his remark as a "consensus-seeking effort" to convince the detectives that he should first talk to an attorney, appellant argues that if Herdt had agreed with him then appellant would then have been in a position to "decline further conversation with the detectives without seeming oppositional or obstreperous to them." Appellant's legal premise that Detective Herdt was required to advise or encourage him to invoke his right to counsel is unsupported by authority. Furthermore, the record does not support appellant's factual argument. Although appellant contemplated consulting an attorney before turning over the gun, he *never* suggested that he did not want to talk to the detectives. To the contrary, he was anxious to explain what had happened. There is no evidence appellant had any concern about appearing oppositional or obstreperous.

Appellant contends that after he broached the subject of talking to an attorney, he "rephrased his position in a more straightforward and clear demand to speak to an attorney" by stating "[j]ust fucking can you call one so I can just ask him a question?" We are not persuaded by this interpretation of appellant's conversation with the detectives. As the trial court found, appellant was considering his options and wondering whether or not to turn over the weapon that everybody knew he had. Spring was also considering her own options and, indeed, may have turned the gun over with or without appellant's consent. (*People v. Carpenter* (1999) 21 Cal. 4th 1016, 1040 ["Evidence need not be suppressed if the prosecution can establish by a preponderance of the evidence that the information would inevitably have been discovered by lawful means."].) In any event, the evidence before the trial court supported its finding that a reasonable officer in the detectives' position would not have interpreted appellant's remarks as an invocation of his right to an attorney.

Finally, appellant insists the fact that his statement took the form of an "interrogatory" does not mean his demand was equivocal. (See *United States v. Hunter* (7th Cir. 2013) 708 F.3d 938, 942 ["Can you call my attorney?"]; *United States v. Wysinger* (7th Cir. 2012) 683 F.3d 784, 795-796 ["[C]an I call one now? [T]hat's what I'm saying."].) This argument is a red herring; the record shows that the trial court's *Miranda* ruling did not hinge on grammar. The court had an audio recording of the entire interaction between appellant and the detectives, starting from when he first contacted them and ending with the completion of his office interview. During that period appellant was unequivocal about his desire to tell the detectives exactly what happened in order to convince them that the shooting was an accident and that Spring had not been involved in appellant's plan to rob Ryden. By contrast, his brief remarks about talking to an attorney were equivocal, contemplative of an option that he decided not to pursue.

34

*Loyd*, 2017 WL 6014413, at \*13-17 (footnote 8 omitted and footnote 9 in original).

### b. Applicable Law

Claims that custodial statements were improperly admitted are analyzed under *Miranda*. The requirements of *Miranda* are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d). *Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005). Habeas relief should be granted if the admission of statements in violation of *Miranda* "had a substantial and injurious effect or influence in determining the jury's verdict." *Calderon*, 525 U.S. at 146.

*Miranda* requires that a person subjected to custodial interrogation be advised prior to questioning that he has the right to remain silent, that statements made can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed. 384 U.S. at 444. Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently. *Id.* at 475. Such a waiver need not be express. *Id.* Whether there has been a valid waiver of *Miranda* rights depends upon the totality of the circumstances, including the background, experience and conduct of the defendant. *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986).

The government must prove, by a preponderance of the evidence, that the defendant was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A showing that there was a proper recitation of *Miranda* rights and that the defendant knew his rights generally is sufficient to establish a knowing and intelligent waiver. *Paulino v. Castro*, 371 F.3d 1083, 1086-87 (9th Cir. 2004).

A suspect who has expressed a desire to have counsel present during custodial interrogation is not subject to further interrogation by the authorities until counsel is made available to him.[7] *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Continued responses to questions from interrogators after a suspect invokes his right to have counsel present do not

---

[7] In addition, once a defendant has invoked the right to counsel, the Sixth Amendment prohibits government initiated interrogation regarding that offense. *See United States v. Harrison*, 213 F.3d 1206, 1211-12 (9th Cir. 2000) (discussing *Michigan v. Jackson*, 475 U.S. 625, 627-28 (1986) *overruled on other grounds by Montejo v. Louisiana*, 556 U.S. 778, 796-97 (2009)).

constitute a waiver of the right. *See Alvarez v. Gomez*, 185 F.3d 995, 998 (9th Cir. 1999). This "prophylactic rule [is] designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990). The applicability of the " 'rigid' prophylactic rule" of *Edwards* requires a court to determine whether the accused actually invoked his right to counsel. *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (quoting *Fare v. Michael C.,* 442 U.S. 707, 719 (1979)). In *Davis v. United States*, the Supreme Court held that "[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations," the determination of whether the accused actually invoked his right to counsel is "an objective inquiry." 512 U.S. 452, 458-59 (1994). The suspect must "unambiguously request counsel." *Id.* at 459. "Although a suspect need not speak with the discrimination of an Oxford don, he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* (citation omitted).

   In *Davis*, the Supreme Court found that the statement "[m]aybe I should talk to a lawyer" was ambiguous, and thus was not a request for counsel. *Id.* at 462. The Supreme Court in *Davis* specifically declined to extend the *Edwards* prophylactic rule to situations where a suspect makes a vague or ambiguous reference to an attorney. *Id.* at 459 ("If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect."). In sum, unless the accused makes an unambiguous request for counsel, the authorities are free to continue questioning.

   While only the Supreme Court's precedents must be considered in evaluating the state court's compliance with clearly established federal law, the Court may look to circuit precedents for guidance. *See Duhaime v. Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 2000); *see, e.g., United States v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005) (defendant's statement "[b]ut, excuse me, if I am right, I can have a lawyer present through all this, right?" does not constitute unambiguous invocation of right to counsel); *Paulino*, 371 F.3d at 1087-88 (defendant's statements "Where's the attorney?" and "You mean it's gonna take him long to come?" plus his failure to fill in item on waiver form asking whether suspect wishes to give up right to counsel, was not unequivocal request for counsel); *cf. Alvarez*, 185 F.3d at 998 (finding suspect's questions "(1) Can I get an

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

attorney right now, man? (2) You can have attorney right now? and (3) Well, like right now you got one?" constituted an unambiguous request).

The Supreme Court has held that a confession is voluntary if it is "the product of an essentially free and unconstrained choice"; it is involuntary where the suspect's "will has been overborne and his capacity for self-determination critically impaired." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). To make this determination, the court must consider the totality of the surrounding circumstances, including "the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The court then asks whether the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne. *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). "While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct." *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). Where a suspect's statement is not coerced, "little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Oregon v. Elstad*, 470 U.S. 298, 312 (1985).

The erroneous admission of a coerced confession is subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 306-12 (1991). In other words, habeas relief is appropriate only if the coerced confession had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637.

### c. Analysis

Petitioner asserts that he was

deprived of his Fifth and Fourteenth Amendment rights to freedom from self-incrimination by the trial court's erroneous admission of his custodial statement[s] notwithstanding his invocation of his right to counsel. Petitioner initially responded to Miranda warnings with the question "Do you think I should have a lawyer." Then followed up with "Just fucking call one for me.["]

Dkt. No. 1 at 5 (brackets added).

As mentioned above, unless the accused makes an unambiguous request for counsel, the

authorities are free to continue questioning. *Davis*, 512 U.S. at 459. Here, Petitioner made two relevant statements. First, Petitioner questioned: "Don't you think I should talk to an attorney?" 5 CT 1346. The state appellate court reasonably determined that, as in *Davis*, *see* 512 U.S. at 462, this question did not rise to the level of an unambiguous invocation, s*ee Loyd*, 2017 WL 6014413, at *16. Petitioner's framing of his second statement is slightly, but significantly, different from the statement in the record: "I mean, just fucking can you call one so I can just ask him a question? Or what?" 5 CT 1346. The state appellate court reasonably found that the evidence before the trial court supported its finding that a reasonable officer in the detectives' position would not have interpreted Petitioner's remark ["can you call one so I can just ask him a question?"] as an invocation of his right to an attorney. *Loyd*, 2017 WL 6014413, at *17; *see also Paulino*, 371 F.3d at 1088 (Ninth Circuit reasoned that stating: "Where's the attorney?" could be construed as an inquiry into the location of the attorney "rather than the assertion of Paulino's subjective desire for a lawyer at that time").

In making its determination that the trial court reasonably found that Petitioner's statements were not coerced, the state appellate court stated that:

> [Petitioner] consistently expressed a desire to communicate with the detectives in order to convince them that the shooting was an accident, and that [Petitioner] briefly contemplated asking for an attorney, but elected instead to engage the detectives in an ongoing dialogue about what had happened and what consequences he faced.

*Id.* at *16. The state appellate court therefore reasonably determined that the trial court's rejection of Petitioner's *Miranda* motion was proper since "[Petitioner's] brief remarks about talking to an attorney were equivocal, contemplative of an option that he decided not to pursue." *Id.* at *17.

In addition, the state appellate court reasonably determined that the detectives' expressed desire to locate the gun was a "legitimate" public safety concern. *Id.* at *16. The *Miranda* rule is subject to several exceptions, including the public safety exception, which allows police officers to "ask questions reasonably prompted by a concern for the public safety" before giving *Miranda* warnings. *New York v. Quarles*, 467 U.S. 649, 655-56 (1984). In order for the public safety exception to apply, there must have been "an objectively reasonable need to protect the police or the public from any immediate danger associated with [a] weapon." *Id.* at 659 n.8; *see, e.g., id.* at

657-58 (trial court erred in excluding defendant's statement that "the gun is over there" in response to officer's question as to the location of the gun when he caught defendant after a brief chase; "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination"). Here, the detectives gave *Miranda* warnings shortly after asking about the location of the gun.[8] 4 CT 1134-1137. The state appellate court reasonably noted that the detectives did not use their concern for public safety "to coerce [Petitioner] to talk about the shooting incident." *Loyd*, 2017 WL 6014413, at *16. The state appellate court thus reasonably concluded that "from the beginning" Petitioner "was anxious to talk about what happened while the detectives were focused on the need to recover the gun." *Id.*

Having carefully reviewed the record, the Court concludes that the state appellate court's rejection of this claim was neither an unreasonable application of, or contrary to, Supreme Court precedent, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

Even if admitting Petitioner's custodial statements resulted in error, it did not have a substantial and injurious effect on the verdict. Both Ryden and Spring testified about the largely undisputed circumstances of the shooting. 3 RT 674-677; 4 RT 897-899. Additionally, Petitioner's non-custodial statements to Spring and Downing were incriminating, as were his non-custodial statements to law enforcement before being read his *Miranda* rights and those he made to Spring while at the sheriff's office. 3 RT 600, 602; 4 RT 900; 4 CT 1001-1006, 1030-1031. Petitioner's post-*Miranda* statements were also admissible to impeach his trial testimony. *See Elstad*, 470 U.S. at 306-07 (The "*Miranda* exclusionary rule" requires exclusion of unwarned statements in prosecution's case-in-chief but not when used for impeachment.); *Harris v. New*

United States District Court
Northern District of California

---

[8] While in the process of adjusting the handcuffs on Petitioner and Spring, Detective Drewrey asked: "Just—I just want to ask this question real quick just so that nobody gets hurt. Is that gun somewhere somebody's going to find it and get hurt with it?" 4 CT 1134. Petitioner responded, "Dude, we'll get the gun." 4 CT 1134. Spring then inquired whether it would be "helpful" for them to "cooperate and get [the gun] in." 4 CT 1143. Petitioner asked the detectives if they could tell him "straight up" if what he was doing "right now" was "the right thing to do." 4 CT 1135. Detective Drewrey then initiated *Miranda* warnings shortly after. *See* 4 CT 1135-1137.

*York*, 401 U.S. 222, 226 (1971) ("The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."). Therefore, any error in the admission of Petitioner's custodial statements was not prejudicial.

Accordingly, Petitioner is not entitled to relief on Claim 4.

### 5. Claim 5: IAC Claims

In Claim 5, Petitioner asserts multiple IAC violations by his trial counsel, David Markham, Esq., including: (a) failure to present evidence; (b) acknowledgment of guilt during closing argument, failure to investigate defenses, and failure to cross-examine effectively; (c) improper closing argument; (d) inadequate investigation; (e) inadequate knowledge of the law; (f) failure to assert a legal defense; (g) admission of guilt without a tactical reason; (h) failure to assert a second shooter defense; and (i) calling Petitioner to testify in support of defense trial counsel had abandoned. Dkt. No. 1 at 6-11.

#### a. State Court Opinions

Petitioner raised on direct appeal his IAC claim relating to Markham's failure to defend the murder charge by arguing that a second shooter fired the bullet that killed Quiett, and the state appellate court outlined the following background and rejected it as follows:

> Appellant contends he was denied his right to the effective assistance of counsel at trial because his attorney failed to defend the murder charge by arguing that a second shooter fired the bullet that killed Cindy Quiett. Appellant made this same claim below, in his unsuccessful motions for new appointed counsel and for a new trial.
>
> *1. Motions for New Appointed Counsel*
>
> On September 15, 2011, the trial court appointed counsel to represent appellant. Eleven days later, defense counsel declared a conflict and the court appointed new counsel for appellant. Two weeks later, appellant's counsel declared an ethical conflict, the nature of which he could not disclose without violating the attorney-client privilege, and a third attorney was appointed to represent appellant. Approximately three years later, in September 2014, appellant's trial counsel declared a conflict during a trial readiness conference, resulting in the appointment of defense counsel David Markham.
>
> At a March 13, 2015 trial readiness conference, appellant made a motion for new appointed counsel pursuant *People v. Marsden* (1970) 2 Cal. 3d 118 (*Marsden*). Appellant complained that Markham was refusing to conduct a sufficient investigation of his case. Markham disagreed, explaining that he had struggled to develop a defense because appellant had made devastating admissions, and the witnesses were not helpful to the defense. Markham also explained that the ballistics expert retained by the defense had concluded that the fact that the

exit wound on [Quiett's] body was lower than the entrance wound did not exclude appellant as [Quiett's] killer. Because of this conclusion, appellant wanted Markham to retain a different expert, which was why Markham had filed a request to continue the jury trial. The court denied appellant's *Marsden* motion and the defense request to continue the jury trial.

At a March 27, 2015 trial readiness conference, appellant made a second *Marsden* motion for new appointed counsel. Appellant complained that Markham had refused to build a defense around the ballistic evidence, which showed the bullet that killed Quiett travelled through her body at a downward angle. According to appellant, the opinion of his ballistic expert that the lethal bullet could have been shot from appellant's gun hinged on the premise that Quiett was leaning forward when she was shot. Appellant wanted Markham to argue that Quiett was standing erect when she was shot by a second unknown assailant. Markham explained that he did not have sufficient evidence to present this theory because nobody saw Quiett before she was shot and there was no evidence of a second shooter. Appellant's second *Marsden* motion was denied.

On April 14, 2015, the first day of trial, appellant made another *Marsden* motion. Appellant complained that Markham was refusing to declare that he had a conflict of interest notwithstanding the fact that he did not have an attorney-client relationship with appellant. Appellant argued that Markham had taken on the role of an adversary by poking holes in appellant's second shooter theory, and that the defense was not ready for trial because Markham refused to investigate the second shooter theory. Markham disagreed with appellant on every count. He explained that appellant's theory was based on misperceptions about the evidence; for example, witnesses who said they saw Quiett standing did not see her when she was shot. Markham also disputed the notion that he did not have an attorney-client relationship with appellant, pointing out that he had met with appellant at the jail 24 times and that appellant never questioned their relationship until two weeks before trial. Markham described his extensive experience as a criminal defense lawyer in capital cases and stated that his disagreement with appellant about trial tactics did not create a conflict for him or cause a breakdown in the attorney-client relationship. Again, the trial court denied appellant's *Marsden* motion.

## 2. The New Trial Motion

After the jury returned their guilty verdicts, Markham was relieved as appellant's appointed counsel and the trial court appointed William Conwell to assist appellant in evaluating whether to file a motion for new trial based on ineffective assistance of counsel.

In a January 2016 motion for new trial, appellant argued he was denied the effective assistance of counsel because, among other things, Markham failed to pursue the potentially meritorious defense that Quiett was shot and killed by a second shooter. Opposing the motion, the prosecutor relied on the dearth of credible evidence to support appellant's second shooter theory and a detailed declaration from Markham, who described his investigation of the case and strategies regarding how to best defend appellant.

At an April 2016 evidentiary hearing, the defense elicited testimony from a new expert who opined that if Cindy Quiett was standing erect when she was shot, appellant's bullet could not have killed her, but she could have been killed by an assailant shooting down at her from a higher area. Appellant's new attorney also conducted an extensive examination of Markham, who provided detailed information about his investigation of the case, his efforts to respond to appellant's requests, and his strategies at trial.

On July 1, 2016, the trial court denied the new trial motion. In a 30-page analysis, the court made findings of fact and law in support of its conclusion that appellant was not denied the effective assistance of counsel during his jury trial. Preliminarily, the court made this brief observation about the quality of Markham's representation: "Mr. Markham's declaration

gives a very thorough and cogent explanation for his tactical decisions through his representation of Defendant. . . . I'm not going to repeat what he said, but he gave a very thorough and cogent explanation." That stated, the court went on to address each objection to Markham's representation in order to evaluate any prejudicial effect.

In response to appellant's objection that Markham did not argue a second shooter theory, the trial court conducted an extensive review of the trial evidence before concluding that this theory was not a potentially meritorious defense, pointing out that, among other things, nobody reported hearing two shots; there was no evidence that Quiett was standing erect when she was shot; and there was "no other shooter suspect." In light of the evidentiary record, the court concluded that using the location of the exit wound on Quiett's body to argue there was a second shooter was speculative and fanciful. Furthermore, because the other shooter theory was "a country mile away from being a potentially meritorious defense," it was not reasonably probable that the outcome would have been more favorable to the defense if that theory had been presented at trial.

### 3. Analysis

To prove his ineffective assistance claim, appellant has the burden of rebutting, by a preponderance of the evidence, a presumption that he received effective assistance, first by showing that trial counsel's performance was deficient, and then by establishing prejudice. (*People v. Lucas* (1995) 12 Cal. 4th 415, 436 (*Lucas*); see also *People v. King* (2010) 183 Cal. App. 4th 1281, 1298 (*King*).) "Where, as here, defendant is represented by different counsel at the motion for a new trial and the issue is called to the trial court's attention, the trial judge's decision is especially entitled to great weight and we defer to his [or her] fact finding power." (*People v. Wallin* (1981) 124 Cal. App. 3d 479, 483.) Ultimately, though, the question "[w]hether counsel's performance was deficient, and whether any deficiency prejudiced [defendant], are both mixed questions subject to independent review. [Citation.]" (*In re Hardy* (2007) 41 Cal. 4th 977, 993.)

In this court, appellant contends Markham's representation was constitutionally inadequate because he failed to (1) investigate the second shooter theory, and (2) present that theory at trial. In addressing these contentions under the first prong of our analysis, we ask whether appellant has carried his burden of proving that Markham's representation of him was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms. (*Lucas, supra,* 12 Cal. 4th at p. 436; *King, supra,* 183 Cal. App. 4th at p. 1298.) "In reviewing counsel's performance, we 'exercise deferential scrutiny.' [Citations.]" (*King,* at p. 1298.) We "defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*Lucas,* at pp. 436-437.)

The record shows that Markham's investigation of the second shooter theory was thorough and reasonable under the circumstances. In his declaration, Markham explained that this theory was conceived by a defense investigator who worked on the case before Markham was appointed to represent appellant. The investigator was not a ballistics expert and the expert that Markham retained was unable to offer an opinion that the lethal bullet was not shot from appellant's gun. Nevertheless, Markham arranged for two investigators to continue to search for evidence of a second shooter, but nothing could be found. Markham also had Quiett's clothing tested for gunshot residue or other evidence, but the test results did not suggest there was a second shooter or eliminate appellant's gun as the source of the bullet that killed Quiett.

This record also provides a sound reason for Markham's decision not to present a second shooter theory to the jury. As Markham explained in his declaration: "Based on the evidence in the case, including the statements of witnesses and [appellant's] thorough and detailed

confession, I did not believe there was any way I could convince the jury there was a second shooter, let alone that a second, unidentified shooter killed Ms. Quiett, without some evidence corroborating such a theory." Beyond that, Markham explained, the prosecutor presented expert testimony that the likely explanation for the location of the exit wound on Quiett's body was that she was "slightly bent over when she was shot." This opinion, which was shared by the defense's original ballistics expert, was another barrier to the second shooter defense because there was no witness who could testify that Quiett was standing erect when she was shot.

Appellant argues that the absence of evidence of a second shooter would not have prevented competent counsel from presenting this theory to the jury because the prosecution rather than the defense had the burden of proving that the bullet came from appellant's gun. According to appellant, presenting the second shooter theory was a risk-free way of reminding the jury they could not convict appellant of felony murder unless they believed that the bullet came from his gun. However, Markham offered a sound tactical reason for his decision not to present this theory. Concerned by the overwhelming evidence against appellant, Markham decided that it was crucial to establish his own credibility with the jury. To do this, Markham elected not to argue (1) the second shooter theory because it lacked evidence support; or (2) the claim of right defense because of the criminal nature of the drug transaction. Instead, Markham made the decision to focus on the causation element of murder, which was the most serious charge. Markham's hope was that by maintaining his credibility with the jury and giving them the opportunity to hold appellant responsible for his conduct by finding him guilty of some serious charges, they would be more inclined to acquit him of murder. This tactical decision was reasonable under prevailing professional norms.

Finally, even if appellant could show that Markham performed deficiently, he would also have to demonstrate that Markham's failure to argue the second shooter theory caused him prejudice. To make this showing, appellant must demonstrate " ' "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " ' [Citation.]" (*Lucas*, *supra*, 12 Cal. 4th at p. 436.) Like the trial court, we conclude that appellant cannot carry this burden here. There was overwhelming evidence that the bullet that killed Quiett came from appellant's gun. Furthermore, there was no evidence that anybody other than appellant had or used a gun at the time that Quiett was shot and killed. If Markham had argued otherwise, it is not reasonably probable that the outcome of the trial would have been more favorable to appellant.

*Loyd*, 2017 WL 6014413, at *18-20 (brackets added). In summary, the state appellate court rejected the IAC claim upon finding that Markham's investigation was thorough and reasonable under the circumstances; he had a sound reason not to present the second shooter defense; his tactical decision to focus on the causation element instead of the second shooter or claim of right defenses was reasonable under prevailing professional norms; and there was no reasonable probability of a different result if he had argued otherwise. *See id.*

The record shows that Petitioner did not raise any IAC claims in his petition for review in the California Supreme Court, and thus he did not exhaust his IAC claims on direct appeal. *See* Dkt. No. 26-13; Resp't Ex. 10. Instead, Petitioner raised IAC claims for the first time before the

California Supreme Court in his state habeas petitions filed on March 19, 2020. *See* Resp't Ex. 18. On June 10, 2020, the California Supreme Court summarily denied the state habeas petition filed on March 19, 2020. *See* Resp't Ex. 19 & 21.

### b. Applicable Law

Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two factors. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms, *id.* at 687-88, "not whether it deviated from best practices or most common custom," *Richter*, 562 U.S. at 105 (citing *Strickland*, 466 U.S. at 690). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689).

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). It is unnecessary for a federal court considering an ineffective assistance of counsel claim on habeas review to address the prejudice prong, i.e., the second factor of the *Strickland* test, if the petitioner cannot establish incompetence, as required under the first prong. *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential," and "when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotation marks omitted). "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied

*Strickland*'s deferential standard." *Id.*

### c. Analysis

Petitioner raises multiple IAC claims related to Markham allegedly rendering ineffective assistance on several grounds in the investigation and presentation of the defense. One IAC claim was raised on direct appeal and addressed by the state appellate court. *See Loyd*, 2017 WL 6014413, at *18-20. However, Petitioner did not include any IAC claims in his petition for review. *See* Dkt. No. 26-13; Resp't Ex. 10. Thus, his IAC claims were raised for the first time in his state habeas petition filed in the California Supreme Court. *See* Resp't Exs. 18 & 20. Because the state supreme court gave no reasoned explanation of its decision on Petitioner's IAC claims, this Court should conduct "an independent review of the record" to determine whether the state supreme court's decision was an objectively unreasonable application of clearly established federal law. *Plascencia*, 467 F.3d at 1197-98; *Himes*, 336 F.3d at 853. Specifically, the Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of th[e] [Supreme] Court." *Richter*, 562 U.S. at 102.

Here, in conducting its independent review of the record, the Court focuses on the state supreme court's summary denial of all the IAC claims, *see* Resp't Ex. 20, to determine whether the state supreme court's decision was objectively reasonable, *Plascencia*, 467 F.3d at 1197-98; *Himes*, 336 F.3d at 853. Because the record also contains a reasoned decision from the state appellate court on one of the IAC claims, this Court will at times look to the reasoning of the state appellate court on direct appeal and determine whether that reasoning could have also supported the state supreme court's summary denial on state habeas.

### i. Claim 5(a): Failure to Present Evidence

Petitioner asserts that he was deprived of the effective assistance of counsel by Markham's "failure to present evidence and argue that the prosecution failed to prove beyond a reasonable doubt that the bullet that inadvertently discharged from the firearm was the bullet that killed Cindy Quiett." Dkt. No. 1 at 6.

45

Failure to present probative, noncumulative evidence in support of a chosen defense strategy is deficient performance absent a reasonable tactical justification. *Alcala v. Woodford*, 334 F.3d 862, 870-71 (9th Cir. 2003) (finding deficient performance and prejudice where counsel failed to present most probative evidence in support of alibi defense, including the only evidence that established time and date of alibi). Where counsel's deficient performance is based on the failure to present evidence, this Court "compare[s] the evidence that actually was presented to the jury with the evidence that might have been presented had counsel acted differently." *Clark v. Arnold*, 769 F.3d 711, 728 (9th Cir. 2014) (citation omitted). A lack of direct evidence that counsel gave constitutionally inadequate advice cannot overcome the presumption that counsel's conduct was within the range of reasonable professional advice. *Burt v. Titlow*, 571 U.S. 12, 23 (2013). "[T]he failure to take a futile action can never be deficient performance." *Rupe v. Wood*, 93 F.3d 1435, 1445 (9th Cir. 1996).

The state supreme court did not unreasonably apply the principles of *Strickland* in rejecting this IAC claim. First, Petitioner did not describe the evidence that Markham purportedly could have presented. Because no evidence was proffered indicating that a bullet other than the one Petitioner fired might have killed Quiett, Petitioner has not overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Additionally, the record shows that substantial evidence was offered to prove Petitioner's gun fired the fatal bullet. The forensic pathologist testified that the downward trajectory of the bullet in Quiett's body did not confirm the location of the shooter since it could be explained by Quiett being slightly bent forward when she was shot. 4 CT 811-812. The pathologist's testimony was consistent with the forensic scientist's opinion, positing that the trajectory of the bullet could not confirm the location of the shooter because it could show either that a shooter was across the street from Quiett (bent over), or that a shooter was on the same street as Quiett (standing erect). 7 CT 2039. Ryden testified that he told Quiett to "get down by the tree" (3 RT 698), suggesting that she would have been hiding rather than in an erect, exposed position. Finally, as Markham explained in his declaration presented during the motion for new trial, there

46

was no evidence of a second shooter, and this was confirmed through the testimony of Defense Investigator Thomas Clements.  7 CT 2014; 8 RT 2010-2011.  In its analysis of this claim, the state appellate court found "reasonable under prevailing professional norms" Markham's "tactical decision" not to argue the second shooter theory "because it lacked evidence support."  *See Loyd*, 2017 WL 6014413, at *19.  The state supreme court also could have also reasonably determined that Markham's failure to present evidence of a second shooter did not amount to deficient performance for the same reason.

Accordingly, the state supreme court reasonably rejected Petitioner's IAC claim relating to the failure to present evidence, and he is not entitled to habeas relief on Claim 5(a).

### ii. Claim 5(b): Acknowledgment of Petitioner's Guilt During Closing Argument; Failure to Investigate Defenses; Failure to Cross-Examine Effectively

Petitioner asserts that he was denied effective assistance of counsel because Markham "acknowledged [Petitioner's] guilt during closing arguments, failed to investigate potentially meritorious defense, and failed to cross examine witnesses effectively."  Dkt. No. 1 at 6.

With respect to Petitioner's first assertion that Markham acknowledged his guilt during closing, the Court notes that conceding a client's guilt during closing does not necessarily amount to ineffective representation.  *See McDowell v. Calderon*, 107 F.3d 1351, 1358 (9th Cir.) (no ineffective assistance where counsel's decision at closing argument to concede guilt of felony murder but contest defendant's intent to kill was "best choice from a poor lot"), *amended*, 116 F.3d 364 (9th Cir.), *vacated in part on other grounds by* 130 F.3d 833, 835 (9th Cir. 1997) (en banc) *overruled in part on other grounds by Weeks v. Angelone*, 528 U.S. 225 (2000); *People v. Jackson*, 28 Cal. 3d 264, 293 (1980) (counsel who conceded defendant's guilt in closing argument was not incompetent in light of overwhelming evidence of defendant's guilt), *overruled on other grounds*, *People v. Cromer*, 24 Cal. 4th 889, 901 n.3 (2001).  Here, three independent sources (including Petitioner) testified that Petitioner held a loaded gun in Ryder's face and said, "Give me your shit."  3 RT 675; 4 RT 898; 6 RT 1414.  Given this overwhelming evidence of Petitioner's guilt as to the attempted robbery, assault, and possession of a firearm, the state supreme court could have determined that Markham's strategy was reasonably aimed at enhancing his credibility

with the jury by not arguing that the prosecution failed to meet its burden as to these crimes during closing arguments. 7 CT 2017-2018. Although the right to effective assistance of counsel extends to closing arguments, "counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003). Because credibility with the jury is a legitimate consideration, Markham's decision fell within the wide range of reasonably professional assistance, and thus the state supreme court's rejection of this claim was not unreasonable. In any event, the record shows that Markham did not concede Petitioner's guilt of felony murder, but instead zealously argued that Petitioner was not guilty of that offense because Quiett's death was not reasonably likely to have happened based on Petitioner's conduct. 7 RT 1723. Petitioner fails to show that this strategy fell below an "objective standard of reasonableness" under prevailing professional norms. *See Strickland*, 466 at 687-88.

Petitioner next asserts that Markham was ineffective because he failed to investigate a potentially meritorious defense. Dkt. No. 1 at 6. However, in Claim 5(b) Petitioner fails to specify what Markham allegedly failed to investigate. *See id.* The state supreme court could have reasonably denied this claim for failure to provide specific facts as to why and how counsel's investigation was lacking. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."). Further, Markham's declaration confirms that he conducted a thorough but ultimately unfruitful investigation into possible alternative defenses. 7 CT 2013-2018. In its analysis of this IAC claim, the state appellate court found that "Markham's investigation of the second shooter theory was thorough and reasonable under the circumstances" and that the record "also provide[d] a sound reason for Markham's decision not to present a second shooter theory to the jury." *Loyd*, 2017 WL 6014413, at *19. "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 382 (2005). The state supreme court likewise could have reasonably rejected this claim

1    for the same reason. Petitioner is not entitled to habeas relief on this basis.

2         Finally, Petitioner argues that Markham failed to cross examine witnesses effectively. Dkt.

3    No. 1 at 6. The Confrontation Clause of the Sixth Amendment provides that in criminal cases the

4    accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI.

5    The federal confrontation right applies to the states through the Fourteenth Amendment. *Pointer*

6    *v. Texas*, 380 U.S. 400, 403 (1965). For purposes of federal habeas corpus review, the standard

7    applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an

8    actual and prejudicial effect upon the jury. *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir.

9    2002) (citing *Brecht*, 507 U.S. at 637).

10        Here again, Petitioner fails to explain how Markham's cross-examination of witnesses was

11    lacking. To assert a successful claim of ineffective assistance, Petitioner is required to "identify

12    the acts or omissions of counsel that are alleged not to have been the result of reasonable

13    professional judgment." *Strickland*, 466 U.S. at 689. Because he failed to do so, the state

14    supreme court could have reasonably rejected Petitioner's claim on this basis.

15        In sum, the state supreme court could have reasonably rejected this claim considering that

16    (1) Markham's acknowledgment of Petitioner's guilt of certain offenses during closing was a

17    reasonable tactical approach, (2) Petitioner failed to specify the ways in which Markham's

18    investigation was lacking, and the record demonstrates that his investigation was thorough, and

19    (3) Petitioner failed to satisfy his burden of identifying how Markham's cross examination was

20    insufficient.

21        Accordingly, Petitioner is not entitled to habeas relief on Claim 5(b).

22                **iii.**       **Claim 5(c): Improper Closing Argument**

23    Petitioner asserts that:

24       [D]uring closing argument, Defense counsel asked the jury to find Mr. Loyd guilty by
         agreeing "Danny Loyd" committed the crime of robbery, assault with a firearm, felon in
25       possession of a firearm, and felon in possession of ammunition. By admitting Mr. Loyd
         was guilty of all crimes consequently by admitting the Robbery then the elements of
26       Felony murder was [sic] met, trial counsel did the [S]tate[']s job.

27    Dkt. No. 1 at 7 (brackets added).

28        This IAC claim mirrors a portion of the claim addressed above under Claim 5(b). As

United States District Court
Northern District of California

previously explained, the state supreme court could have reasonably concluded that Markham's closing argument was a reasonable strategy to maintain credibility, with the goal of persuading the jury to acquit on the felony murder charge despite the overwhelming evidence as to the other offenses. The state supreme court therefore could have reasonably concluded that the closing argument did not result in Petitioner receiving ineffective assistance. Accordingly, Petitioner is not entitled to habeas relief on Claim 5(c).

### iv. Claim 5(d): Inadequate Investigation

Petitioner asserts that Markham's actions in investigating the second shooter defense were inadequate because "[d]efense counsel did not secure a[n] expert witness who could testify Mr. Loyd's pistol could not have shot Ms. Quiett if she were standing erect, [and] [d]efense counsel was unprepared when 'Cynthia Downing' testified Ms. Quiett was standing erect at the time of the shooting." Dkt. No. 1 at 7 (brackets added).

As the state appellate court explained, the second shooter theory was first conceived by a defense investigator who worked on the case before Markham was appointed, and who was not a ballistics expert. *See Loyd*, 2017 WL 6014413, at *19. Markham determined that he could not establish the presence of a second shooter without assistance from a ballistics expert witness. 7 CT 2013. He therefore retained Peter Barnett, a qualified ballistics expert, to examine the "information concerning the slope of the scene and distances between various landmarks and locations." 7 CT 2013-2014. Based on the available evidence, Barnett was unable to testify that Petitioner could not have been the shooter. 7 CT 2014. Markham determined that, without Barnett's affirmative testimony that Petitioner could not have been the shooter, a second shooter defense could not reasonably be brought since there was no other evidence of a second shooter. 7 CT 2014. Hoping to uncover such evidence, Markham worked with Defense Investigator Venturi and Petitioner in order to "try to find some evidence that there was a second shooter." 7 CT 2014. Barnett's report indicated that the downward trajectory of Quiett's injury could be explained either by her being bent forward when hit by a bullet fired across the street or standing erect when hit by a bullet fired from the same side of the street. 7 CT 2039. If the bullet was fired from the same side of the street as Quiett, Barnett concluded that he would expect to find gunpowder residue on

United States District Court
Northern District of California

her clothing. 7 CT 2040. Markham therefore sought and received authorization to test Quiett's clothing for gunpowder residue to support the theory that a second shooter shot Quiett from a range much closer than where Petitioner was standing. 7 CT 2015. Barnett determined that "[t]he conclusions based on the testing did nothing to establish the presence of another shooter [or] exclude [Petitioner] as a shooter." 7 CT 2015. The state supreme court could have reasonably found that Markham was entitled to rely on the opinions of Barnett as a well-qualified ballistics expert. *Hendricks v. Calderon*, 70 F.3d 1032, 1039 (9th Cir. 1995) ("If an attorney has the burden of reviewing the trustworthiness of a qualified expert's conclusion before the attorney is entitled to make decisions based on that conclusion, the role of the expert becomes superfluous.").

In addition, Markham took extra steps to obtain additional authorization to hire a second investigator, Defense Investigator Clements, to conduct further investigation into the possible discovery of a second shooter, but "no evidence of a second shooter was found." 7 CT 2014. Based on this fact, Markham concluded:

> It is my professional opinion that I have done everything reasonably possible to investigate the existence of a second shooter. However, despite everything that was done, no evidence was discovered to support that theory. Based on the evidence in the case, including the statements of witnesses and Mr. Loyd's thorough and detailed confession, I did not believe there was any way I could convince the jury there was a second shooter, let alone that a second, unidentified shooter killed Ms. Quiett, without some evidence corroborating such a theory.

7 CT 2015. Finally, Markham noted in his declaration that:

> During the trial, two key pieces of evidence reinforced my opinion that [it] would be impossible to convince a jury that a second shooter was responsible for Ms. Quiett's death. First, the prosecution's pathologist testified that the downward path of the bullet was likely caused by the fact that Ms. Quiett was slightly bent over when she was shot. This same opinion was shared by Mr. Barnett. Second, nobody was able to testify Ms. Quiett was erect when she was shot. Cynthia [D]owning testified she saw Ms. Quiet[t] standing at some point but did not see her get shot. Unfortunately, she was very clear that she did not see Ms. Quiett's position precisely at the time she was shot.

7 CT 2015 (brackets added).

In summary, Markham hired two separate investigators to search for evidence that might allow a ballistics expert to testify as to the possibility of a second shooter. Just as the state appellate court reasonably concluded that Markham conducted a "thorough and reasonable" investigation of the second shooter defense, *see Loyd*, 2017 WL 6014413, at *19, the state

United States District Court
Northern District of California

supreme court reasonably could have reached the same conclusion. After having uncovered no such evidence, Markham believed it to be to Petitioner's tactical advantage not to advance a second shooter defense without any basis in evidence. Applying the deferential standard required of a review of an IAC claim, it is not unreasonable for the state supreme court to have rejected this claim because Markham's strategy "was within the 'wide range' of reasonable professional assistance." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689).

Petitioner also contends that Markham was deficient in being unprepared when Downing testified that Quiett was standing erect at the time of the shooting. Dkt. No. 1 at 7. On direct, Downing testified that she was sleeping in a van driven by Petitioner when she was woken up by a loud sound, and as the van was driving away, she saw Quiett "holding her purse like this and . . . saying 'Oh my God.'" 3 RT 592. Downing added that when she turned around as they were pulling away, she saw Quiett "drop[] to her knees." 3 RT 592-593. Downing made no other statement indicating that Quiett was standing erect at the time of the shooting. 3 RT 583-604. During cross, Markham highlighted the unreliability of Downing's memory due to her methamphetamine use as well as the fact that she did not see Quiett get shot. 3 RT 605-606. The state supreme court reasonably could have determined that Markham did not question Downing further about Quiett's position at the time she was shot because Downing testified that she did not see the shooting occur. 3 RT 605-606.

Accordingly, the state supreme court had an objectively reasonable basis for rejecting Petitioner's IAC claim that Markham's actions in investigating the second shooter defense were inadequate, and Petitioner is not entitled to relief on Claim 5(d).

### v. Claim 5(e): Inadequate Knowledge of the Law

Petitioner claims that:

> Defense counsel rested his case on a faulty premise, namely, he could admit the robbery and then argue "Daniel Loyd" did not cause the death of Ms. Quiett, because her shooting was unintentional, accidental or negligent, this is faulty, because this is a Felony Murder Rule case and the felony is robbery.

Dkt. No. 1 at 8.

The Sixth Amendment does not guarantee defendants the right to error-free representation.

52

United States District Court
Northern District of California

1   *See, e.g., Featherstone v. Estelle*, 948 F.2d 1497, 1507 (9th Cir. 1991) ("[T]rial counsel's

2   performance, although not error-free, did not fall below the *Strickland* standard.  Thus, petitioner

3   was not prejudiced by appellate counsel's decision not to raise issues that had no merit.").  Rather,

4   the Sixth Amendment guarantees a representation that is free from serious error.  *Strickland*, 466

5   U.S. at 687.  Counsel's conduct constitutes serious error where it undermines the proper

6   functioning of the adversarial process such that the trial cannot be relied upon as having produced

7   a just result.  *Id.* at 686.

8         A defense attorney can make reasonable strategic decisions to maintain credibility with the

9   jury and advance legal argument aimed at "something akin to jury nullification."  *Gallegos v.*

10  *Ryan*, 820 F.3d 1013, 1029-1030 (9th Cir.), *amended*, 842 F.3d 1123 (9th Cir. 2016) (finding that,

11  given the circumstances, defense counsel "could have seen his best hope as being that the jury

12  might get lost in the morass of evidence and legal theories and convict Gallegos of some offense

13  less than first-degree murder out of mercy or confusion, ignoring the charge of first-degree felony

14  murder.")

15        Defense counsel's performance is not deficient where, as here, counsel "did what he could

16  with what he had to work with, which was not much."  *Gerlaugh v. Stewart*, 129 F.3d 1027, 1033

17  (9th Cir. 1997).  Given the circumstances and lack of a viable defense, the state supreme court

18  reasonably could have determined that Markham strategically and competently performed his duty

19  to Petitioner.  The fact that this strategy did not result in an acquittal does not mean counsel was

20  ineffective.

21        Accordingly, Petitioner is not entitled to relief on Claim 5(e).

22              **vi.      Claim 5(f): Failure to Assert a Legal Defense**

23        Petitioner claims that Markham "tried to assert a defense that because the killing during a

24  felony murder was not foreseeable, therefore 'Daniel Loyd' must not be convicted of murder, it is

25  clear black letter law that the facts in this case do not support such a defense and other defenses

26  were available."  Dkt. No. 1 at 8.

27        As discussed with respect to Claims 5(b) and 5(d), the state supreme court reasonably

28  could have concluded that Markham's defense strategy was "within the wide range of reasonable

professional assistance." *Strickland*, 466 U.S. at 689. Additionally, as to Claim 5(f), Petitioner fails to specify what other defenses may have been available to him. *See* Dkt. No. 1 at 8. Having failed to provide specific facts other than a conclusory allegation, *see James*, 24 F.3d at 26, and affording counsel's decisions the required deference, *see Yarborough*, 540 U.S. at 5-6, the state supreme court reasonably rejected this IAC claim.

Accordingly, Petitioner is not entitled to habeas relief on Claim 5(f).

### vii. Claim 5(g): Counsel Admitted Guilt without a Tactical Reason

Petitioner alleges that Markham admitted that Petitioner was guilty without a tactical reason. Dkt. No. 1 at 9.

As addressed above with respect to Claims 5(b) and 5(c), the state supreme court could have reasonably concluded that Markham's admission of Petitioner's guilt of the other offenses (i.e., attempted robbery, assault, and possession of a firearm) was a reasonable tactical approach. Accordingly, Petitioner is not entitled to habeas relief on Claim 5(g).

### viii. Claim 5(h): Failure to Assert Second Shooter Defense

Petitioner contends that Markham withdrew the use of an expert witness to testify regarding a second shooter without any other valid defense in its place. Dkt. No. 1 at 9. Petitioner argues that "[c]onsequently, counsel's actions amounted to virtual abandonment of his client[']s defense, 'structural error at it's [sic] best.'" *Id.* (brackets added).

As addressed above with respect to Claims 5(a), 5(b) and 5(d), the state supreme court did not unreasonably reject this claim of ineffective assistance relating to Markham's investigation of or failure to present a second shooter defense because Markham's representation was within the wide range of professional competence. *See Richter*, 562 U.S. at 104. Accordingly, Petitioner is not entitled to habeas relief on Claim 5(h).

### ix. Claim 5(i): Calling Petitioner to Testify in Support of Defense Trial Counsel Had Abandoned

Petitioner asserts that Markham rendered ineffective assistance by calling Petitioner to testify in support of a defense Markham supposedly had abandoned, stating that:

Trial counsel was ineffective for calling [Petitioner] to testify regarding a defense that trial

counsel chose to abandon. Here, "David Markham's" decision to not rely upon a claim of right[9] defense after "Daniel Loyd" testified can be analogized to Lucy Van Pelt pulling the football away from Charlie Brown. There was no new evidence that came to light that might have justified his sudden withdrawal of this defense after counsel made the decision for him to testify.

Dkt. No. 1 at 10 (footnote added).

Markham explained in his declaration that at the time trial started, he believed that the claim of right defense (that Petitioner's testimony supported) could result in an acquittal or a hung jury. 7CT 2016. Markman was concerned about this defense because it contradicted what Petitioner had initially told the police and there was a possibility the trial court could decide to instruct the jury that the claim of right defense does not apply when contraband is the subject of the taking. 7CT 2016. Markham provided the relevant background on available defenses and details on his strategic decision-making process as follows:

> Prior to trial, Mr. Loyd informed me [he had] intended to take from Mr. Ryden, drugs that he had loaned to Mr. Ryden. A necessary element of the charge of robbery is that the property taken belong to another. When trial started, I believed defending the charges of felony murder and robbery by attacking this single element of robbery was Mr. Loyd's best chance of obtaining an acquittal to the murder charge or at least, a hung jury. I handled the case with this defense in mind. I cross examined witnesses with this defense in mind and presented evidence with this defense in mind. However, I was concerned about arguing this theory for two reasons. First, Mr. Loyd appeared incredibly honest and sincere when he spoke to the investigating officer. However, his statements to the officer during his confession contradicted the theory that the drugs he was attempting to take were loaned to Mr. Ryden. Second, I believed that there was a possibility that after argument the Judge would instruct the jury that this defense was not available because a claim of right defense is not available when contraband is the subject of the taking. If that happened, Mr. Loyd would have no chance of success at trial. It appeared to be a very risky approach. Furthermore, I was concerned that presenting such a defense could be considered ineffective assistance of counsel if I was not successful . . . .

> Because the second shooter defense was not viable, and because of the risks of the missing element defense relating to robbery, I wanted to defend the case based on causation (foreseeability) argument. I believe[d] a jury would feel that this was truly an accident, Mr. Loyd's remorse was sincere, and that he would have no reason to believe Ms. Quiett risked death by his conduct. I believed, based on my experience, that an argument based on foreseeability offered Mr. Loyd the greatest chance of success in beating the most serious charge. However, the Judge indicated early on that CALCRIM [No.] 240 would not be given, although he left open the possibility that he could change his mind.

> During the course of the trial I handled the case keeping both the "missing element" defense and the "foreseeability" defense in mind. On the morning of closing arguments, I

---

[9] California's claim of right defense "provides that a defendant's good faith belief, even if mistakenly held, that he has a right or claim to property he takes from another negates the felonious intent necessary for conviction of theft or robbery." *People v. Tufunga*, 21 Cal. 4th 935, 938 (1999).

had two Power Point presentations and two closing arguments prepared.  One for the "missing element" defense and one for the "foreseeability" defense.  On the morning of closing arguments the Judge determined that he was going to give the foreseeability instruction, CALCRIM [No.] 240.  When the judge stated this I had the option of arguing either defense.  For the reasons previously stated I decided that the "foreseeability" argument gave Mr. Loyd the best chance of success.  My opinion was further supported by the fact that if I argued "foreseeability," Mr. Loyd would not appear to have been dishonest in his testimony.  Nothing he said appeared to be calculated to help his defense if the defense was based on foreseeability.  This would not have been the case if I argued that "missing element" defense.

I did consider arguing both defenses.  However, I decided not to do so because I believed and still believe I would have lost credibility with the jury had I argued the "missing element" defense given the inconsistencies between Mr. Loyd's confession and his testimony at trial.

Because my defense was based on the lack of "foreseeability" I was unable to credibly argue that defendant did not commit robbery or the other charges.  I saw this as a benefit to Mr. Loyd.  As previously stated, I believed by conceding these charges, it would have the effect of (1) enhancing my credibility thereby causing the jury to give more credence to my argument and (2) allowing the jury to hold Mr. Loyd responsible for his conduct even if they acquit him of the murder charges.

As the case stands now, Mr. Loyd will never get out of custody.  Had my argument persuaded the jury, even though he would have been incarcerated for a long period of time, he would have had an out date.  Bearing in mind the overwhelming evidence against him, that is what I was fighting for.  Every decision I made in this case was a tactical one based on my experience and designed to give Mr. Loyd an opportunity to be released some day.

7 CT 2016-2018 (brackets added).  The record shows that the trial court did ultimately instruct that the "claim of right defense does not apply if the claim arose from an activity commonly known to be illegal or known by the defendant to be illegal."  7 RT 1756.

As evident from the trial strategy outlined in his declaration, Markham called Petitioner to testify to keep all defense options open until his closing argument.  7 CT 2016-2018.  Thus, the record demonstrates that Markham had not abandoned the claim of right defense at the time Petitioner testified.  7 CT 2016-2018.  The state supreme court could have determined that Markham reasonably believed that having Petitioner testify in support of a claim of right defense was a viable defense option, especially since the prosecution had introduced overwhelming evidence of Petitioner's guilt.  *See Richter*, 562 U.S. at 106 ("Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach.").  Considering the "wide latitude" Markham had in making tactical decisions about how best to represent a client, *see Yarborough*, 540 U.S. at 5-6, the state supreme court could have

1    found reasonable Markham's tactical decision to eventually abandon the claim of right defense.

2    Accordingly, Petitioner is not entitled to relief on Claim 5(i).

3                                    **x.    Summary**

4         In sum, the state supreme court could have reasonably concluded that there was no

5    deficient performance or resulting prejudice from Markham's investigation and presentation of the

6    defense.  Petitioner has made no showing that the state supreme court's summary denial of his

7    IAC claims was either contrary to or an unreasonable application of *Strickland*.  Therefore,

8    Petitioner is not entitled to relief on Claims 5(a) through 5(i).

9              **6.    Claim 6: Cumulative Error Relating to IAC Claims**

10        In Claim 6, Petitioner argues that Markham's errors outlined above in Claim 5 resulted in

11   cumulative error.  Dkt. No. 1 at 10.  Specifically, Petitioner asserts that Markham's cumulative

12   errors "are 'many' and all together they are a breakdown of the adversary process caused by

13   deficiency in counsel's assistance, the structural error has affected the framework within which the

14   trial proceeds."  *Id.*

15        The Ninth Circuit has held that in exceptional cases, although no single trial error is

16   sufficiently prejudicial to warrant reversal, the cumulative effect of several trial errors may

17   prejudice a defendant so much that his conviction must be overturned.  *See Alcala*, 334 F.3d at

18   893-95 (reversing conviction where multiple constitutional errors hindered defendant's efforts to

19   challenge every important element of proof offered by prosecution).  Cumulative error is more

20   likely to be found prejudicial when the government's case is weak.  *See id.*

21        However, where there is no single constitutional error existing as to Petitioner's claims,

22   including his IAC Claims (Claim 5), nothing can accumulate to the level of a constitutional

23   violation.  *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011) (if "no error of constitutional

24   magnitude occurred, no cumulative prejudice is possible").  Because no single constitutional error

25   existed and no performance by counsel was deficient, there is no cumulative error either.  *See id.*

26        Accordingly, Petitioner is not entitled to relief on Claim 6.

27   **V.    CERTIFICATE OF APPEALABILITY**

28        The federal rules governing habeas cases brought by state prisoners require a district court

                                         57

that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard, *id.* § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

## VI. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk of the Court shall close the file.

**IT IS SO ORDERED.**

Dated:  6/3/2021

HAYWOOD S. GILLIAM, JR.
United States District Judge